*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DANIEL SIMMONDS, as Personal
Representative of the Estate of Kevin Joseph
Simmonds, Deceased,
　　　　　　　　*Plaintiff-Appellant*,

　　　　　v.

GENESEE COUNTY; JOSH DIRKSE; JAMES
COMSTOCK; KEVIN SHANLIAN; DOUGLAS
GEORGE STONE,

　　　　　　　　*Defendants-Appellees*.

No. 10-1470

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 09-12286—Marianne O. Battani, District Judge.

Argued: January 12, 2012

Decided and Filed:  June 19, 2012

Before:  MERRITT and COLE, Circuit Judges; VARLAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Heather Anne Glazer, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, P.C., Southfield, Michigan, for Appellant.  John G. Fedynsky, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Mary Massaron Ross, PLUNKETT COONEY, Detroit, Michigan, for Appellees.  **ON BRIEF:** Victor S. Valenti, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, P.C., Southfield, Michigan, for Appellant.  James T. Farrell, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Mary Massaron Ross, Hilary A. Ballentine, PLUNKETT COONEY, Detroit, Michigan, for Appellees.

　　　COLE, J., delivered the opinion of the court, in which VARLAN, D. J., joined. MERRITT, J. (pp. 12–14), delivered a separate dissenting opinion.

------

[*] The Honorable Thomas A. Varlan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

————————————

**OPINION**

————————————

COLE, Circuit Judge.  Daniel Simmonds appeals the district court's grant of the defendants' motions for summary judgment on the basis of qualified immunity.  As the defendants' actions entitled them to qualified immunity, we AFFIRM.

I.

*A. Factual Background*

On November 23, 2007, Genesee County police received multiple 911 calls regarding Kevin Simmonds's threatening behavior.  Kevin's father, Daniel Simmonds ("Simmonds"), called to report that Kevin had threatened to kill his ex-girlfriend's parents.  Beverly Carey, the mother of Kevin's ex-girlfriend, also called 911 to report Simmonds's death threat.  Michigan State Police Troopers Doug Kaiser and Joshua Dirkse were dispatched, and received backup assistance from Richfield Township Officer Michael Bernard, Genesee County Lieutenant Kevin Shanlian, Genesee County Sheriff Deputy James Comstock, Genesee County Deputy Douglas Stone, and Genesee County Sergeant William Tucker.  Kaiser, Bernard, Shanlian, and Comstock responded to the Carey residence; meanwhile, Dirkse, Stone, and Tucker responded to the Simmonds's home.  When the officers arrived at the Carey residence, they confirmed that Kevin was not at the home, and Carey informed them that Kevin had left a message on her answering machine saying that "he was coming over to kill them and send them to the promised land."  Kaiser remained at the Carey residence to complete paperwork, while the other three officers went to the Simmonds's residence to assist Dirkse, Stone, and Tucker.

The officers arrived at the Simmonds's property and first met with Simmonds to formulate a plan to apprehend Kevin.  When the officers arrived, it was dark out and they were unfamiliar with the rural property, which was surrounded by a heavily-wooded area.  Simmonds told the officers that he was worried about Kevin's mental state, as

Kevin had been drinking, "wasn't acting right," and was possibly suicidal. Simmonds further cautioned the officers that Kevin owned a pistol and a shotgun, although he did not know whether Kevin was armed. After speaking with Simmonds, the officers planned to prevent Kevin's escape from the property by blocking the private road from the home to the public road and attempting to negotiate with him, using shields and helmets for their own protection. Dirkse and Tucker positioned their vehicles at the beginning of the long private road that led from the Simmonds's home into the heavily-wooded part of the property.

Before the officers could fully implement their plan, Kevin drove up the private road, approaching the location where Dirkse's and Stone's patrol cars were stationed. The two officers activated their overhead lights and ordered Kevin to raise his hands and exit the vehicle. A patrol video camera captured these requests clearly. Instead, Kevin shifted his pick-up truck into reverse and backed down the private roadway into a heavily-wooded area. Dirkse, Tucker, Comstock, Bernard, and Stone followed Kevin in their patrol cars. During the pursuit, Kevin's truck became stuck in the snow, so the officers exited their patrol cars and began approaching Kevin's vehicle while repeatedly ordering Kevin to show his hands—a command Kevin ignored. At that point, the situation quickly escalated.

Because Kevin refused to comply, Stone approached Kevin's truck, opened the door, yelled "Taser, Taser," and then deployed his state-issued taser with the hopes of subduing Kevin. At first, Stone believed the taser had successfully subdued Kevin because immediately following its deployment, Kevin leaned toward the center console and passenger seat as if he had been tranquilized. In fact, Kevin's thick winter jacket prevented the taser from properly functioning.

According to the five officers on the scene, Kevin arose from the passenger seat after the failed taser attempt, yelled that he had a gun and turned toward the officers with his hands extended in a firing position. Stone testified in his deposition that after he deployed the taser, "Kevin roll[ed] to the passenger side of his vehicle, [and] seconds later he yell[ed] that he ha[d] a gun." Stone further testified that, fearing he would be

shot in the face, he turned around and attempted to make his way back to his patrol vehicle. Bernard and Tucker both testified in their depositions that they heard Kevin yell "I got a gun" or "I have a gun" immediately after Kevin reared up from the console area. Tucker also reported that Kevin extended his arm, as if he had a gun in his hands. Comstock testified that Kevin punched his hands out of the open car window, in a shooting position, with what Comstock believed was a silver handgun. Fearing for his safety, Comstock did not hesitate and immediately fired several shots at Kevin. Dirkse similarly reported seeing a silver object in Kevin's hand, but recalled that Kevin was attempting to exit the car through an open door when he pointed the weapon. Dirkse testified that he observed Kevin yelling "I have a gun, I have a gun," while holding his hands "together as if he was pointing or holding a gun, point[ing] it in the direction of me and the other officers." After Kevin allegedly threatened the officers, Dirkse immediately fired shots at Kevin.

Immediately after the shooting, Comstock and Stone began administering life-saving procedures on Kevin until an ambulance arrived to take him to the hospital. Despite these efforts, Kevin did not survive. As the police removed Kevin from the vehicle, they found a silver and blue cell phone with the antenna extended on the front passenger seat. The police also later found a .22 caliber rifle lying in the snow on the ground, several car lengths away from Kevin's truck.

*B. Patrol Car Video*

The video camera in Dirkse's patrol car captured a portion of these events. The video begins with Dirkse arriving at the Simmonds's property, and soon thereafter exiting the vehicle to confer with Simmonds and the other officers. This conversation with Simmonds was not captured on videotape. When Dirkse reenters the car, the video clearly picked up—over the sound of music on the radio—his statements on the patrol radio informing fellow officers that Kevin may be mentally unstable and may have been drinking. The video next shows Dirkse's patrol car driving down the Simmonds's private roadway. When Dirkse first encountered Kevin's vehicle, the video makes clear that Dirkse exited his car and yelled "Let me see your hands" and "Get out of the car."

After Kevin failed to comply with these orders and drove his car in reverse down the private road, the video shows Dirkse returning to his car, turning it around, and following Kevin and the other patrol cars down the road.

As Dirkse arrived at Kevin's car which was stuck in the snow, the video shows that Dirkse parked and exited, again leaving the car running, including the video camera and car radio. Because a police SUV parked directly in front of Dirkse's car, and obstructed the view, the video does not visually capture any more of the relevant events. Rather, the video shows only the hood of Dirkse's car and the rear of the police SUV—neither Kevin nor his vehicle are visible. Additionally, because there was music playing on the radio, the video could not capture any audible statements from either the officers or Kevin. Over the music, the only audible sound is Dirkse cocking his gun as he opens the driver's side door and, later, the gunshots. The video picks up no further sound, including the officer's commands to Kevin to show his hands, Stone's "Taser, Taser" warning, or Kevin's threat that he had a gun. After the shots were fired, the video shows officers returning to their vehicles to retrieve medical and lifesaving equipment. The video could not capture the lifesaving procedures unfolding at Kevin's car, however, it does show a few officers conversing at this time, again with no audible conversation.

*C. Procedural Background*

Simmonds, as the personal representative of Kevin's estate, filed a lawsuit under 42 U.S.C. § 1983 against the County of Genesee, Michigan, alleging failure to supervise, monitor, and train its officers, as well as Dirkse, Comstock, Shanlian, and Stone, alleging Fourth, Eighth, and Fourteenth Amendment violations. Simmonds later amended this complaint to remove the Eighth and Fourteenth Amendment claims. The officers all filed individual answers, asserting qualified immunity and later moved for summary judgment on this basis. The district court granted a continuance to permit Simmonds to depose the officers present.

Following their depositions, the officers filed supplemental briefing in support of their motions for summary judgment, arguing that the depositions failed to disclose any genuine issue of material fact. Simmonds opposed the motion, on the basis of two

factual discrepancies.  First, Simmonds raised an alleged discrepancy in Dirkse's and Comstock's testimony concerning where Kevin pointed the alleged weapon.  Comstock testified that Kevin was "squarely facing" him when he brandished the silver object, whereas Dirkse stated that he saw Kevin "pointing it towards [Dirkse] and other officers standing next to [Dirkse.]"  Simmonds's supplemental briefing noted that the two officers were standing roughly ten feet apart, and asserted that this testimony evidences a material factual discrepancy.  Second, Simmonds noted conflicting testimony concerning the door of Kevin's vehicle at the time of the incident.  Although Comstock and Dirkse both testified that Kevin yelled that he had a gun and simultaneously brandished a silver object, Comstock explained that Kevin brandished the weapon through the open driver's side window, whereas Dirkse stated that it was through the open driver's side door.

The district court found these two factual inconsistencies insufficient to withstand summary judgment, as neither discrepancy involved a genuine issue of material fact.  The resolution of these factual inconsistences had no bearing on the officers' entitlement to qualified immunity, as these facts did not alter the reasonableness and permissibility of the officers' use of force.  Therefore, the district court granted the officers' motions for summary judgment on the basis of qualified immunity.  Simmonds timely appealed, challenging only the grant of summary judgment as to Comstock and Dirkse, and did not appeal the order as it applied to Stone and Shanlian.

## II.

Government officials are immune from civil liability under 42 U.S.C. § 1983 when performing discretionary duties, provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity seeks to prevent government officials, such as police officers, from being held liable for reasonable mistakes of law, fact, or mixed questions of law and fact made while acting within their scope of authority.  *See Groh v. Ramirez*, 540 U.S. 551, 566-67 (2004) (Kennedy, J., dissenting).  To determine whether qualified immunity shields a

government official's action from § 1983 liability, we apply the two-prong *Saucier* test and inquire (1) whether the officer violated a constitutional right and (2) if so, whether that constitutional right was clearly established such that a "reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citation and internal quotation marks omitted), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Once a defendant raises qualified immunity, "the burden is on the plaintiff to demonstrate that the official[ is] not entitled to qualified immunity," *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006), by alleging "facts sufficient to indicate that the [government official's] act in question violated clearly established law at the time the act was committed," *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992). To defeat the qualified immunity bar, a plaintiff "must present evidence sufficient to create a genuine issue as to whether the defendant committed the acts that violated the law." *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994).

The district court found Simmonds unable to meet this burden, as the two inconsistencies Simmonds raised—the discrepancy in the direction the alleged weapon was pointed and the positioning of the vehicle door—failed to create a genuine issue as to whether the officers' use of force was a violation of Kevin's constitutional rights. As the qualified immunity inquiry arises in the summary judgment context, to create the requisite genuine issue of material fact, the plaintiff must raise "disputes over facts that might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Such a dispute is only considered a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009) ("To make out a *genuine* issue of material fact, plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her."). We review the district court's grant of summary judgment on the grounds of qualified immunity de novo. *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005).

In determining whether Comstock and Stone are entitled to qualified immunity, under the first *Saucier* prong, we must identify "the specific constitutional right allegedly infringed," *Graham v. Connor*, 490 U.S. 386, 394 (1989), and subsequently determine whether that right was violated. As Simmonds raises a Fourth Amendment claim, alleging that officers used excessive force in seizing Kevin, the relevant question is whether the officers' use of force complied with that allowable under the Fourth Amendment. Any claim of excessive force is evaluated under the objective standard of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id* at 397.

Although a number of factors influence this objective reasonableness determination, such as "the severity of the crime at issue [and] whether the suspect poses an immediate threat to the safety of the officers or others," *id.* at 396, "the ultimate question is whether the totality of the circumstances justifies a particular sort of seizure," *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (citation and internal quotation marks omitted). In evaluating the totality of the circumstances and the objective reasonableness of the force, we "must be sure to view [the] facts 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396). This objective reasonableness analysis "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances . . . ." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Here, the totality of the circumstances, as known to Comstock and Dirkse at the time of the incident, warranted the use of deadly force. The officers were aware that Kevin had threatened to kill his ex-girlfriend's parents, as both Simmonds and Carey separately called 911 to report these threats. The officers were further informed that

Kevin had been drinking, was displaying mentally unstable behaviors, and was possibly suicidal. They also knew that Kevin owned a pistol and a shotgun and that he might be armed. Once the officers came into contact with Kevin, he refused to comply with their request to raise his hands and exit his truck, and instead shifted the truck into reverse and fled into a heavily-wooded area of his parent's property. After Kevin's vehicle became stuck in the snow, he again ignored repeated orders to show his hands and, even after officers attempted to use a taser to subdue him, threatened the officers by yelling "I have a gun," and brandishing a silver object, and pointing it at the officers, as if it were a weapon. Although 20/20 hindsight now informs us that Kevin was unarmed at the time, all of the information available to the officers *at the time they used force* constituted probable cause that Kevin "pose[d] a threat of serious physical harm . . . ." *Id.* at 11.

To satisfy the first *Saucier* prong and establish a constitutional violation to defeat the officers' claim of qualified immunity, Simmonds "is obliged to present facts which if true would constitute a violation of clearly established [Fourth Amendment] law." *Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987). Specifically, he must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). Simmonds has presented no such facts. Once Kevin yelled "I have a gun" and pointed a weapon-like object at the officers in a firing position, in light of all the other information officers possessed regarding Kevin's mental instability and threatening behavior, the officers were constitutionally permitted to use deadly force. *See Garner*, 471 U.S. at 12; *Dudley v. Eden*, 260 F.3d 722, 727 (6th Cir. 2001). Simmonds has not alleged any material facts disputing the officers' uniform testimony on these matters and has instead relied on factual discrepancies immaterial to his claim. Nevertheless, Simmonds summarily asserts that the discrepancies are material, without alleging any factual or legal basis as to why these two immaterial discrepant facts constitute a genuine issue for trial.

Both Simmonds and the dissent rest their theories for relief on a series of inconsistencies. The dissent is premised on a disparity between the officers' testimony and what was heard on the video. Because one cannot hear Kevin yell "I have a gun" on the videotape, the dissent infers that "it is unlikely that the victim ever said he had a gun."[1] This is an overstatement, to say the least. In the key moments leading up to the shooting, as the officers approached Kevin's car stuck in the snow, there are absolutely no audible statements.[2] It is not, as the dissent suggests, just Kevin's threat that is inaudible. The officer's commands to Kevin to show his hands and Stone's warning about deploying the taser are also absent. To adopt the dissent's theory one would have to reasonably infer that this group of police officers approached Simmonds and, without warning or hesitation, shot him. Such an inference stretches the definition of "reasonable" beyond its natural boundary.

The inconsistencies Simmonds points to—the direction of the weapon and the positioning of the door—are not genuine issues for trial. As the district court correctly concluded, it is immaterial whether Simmonds pointed the object squarely at Comstock or in the direction of Dirkse and the other officers. In either scenario, the officers were permitted to use deadly force in light of the uncontested statement by Kevin that "I have a gun." Similarly, it is of no consequence whether Simmonds brandished the alleged weapon through an open door or window as the officers' statements are consistent in that Kevin brandished an alleged weapon. Indeed, these discrepancies fail to give rise to any

---

[1]In addition to discussing audible sounds, the dissent points to Dirkse's clearly audible commands from when he first encountered Kevin and directed Kevin to show his hands and get out of the car. What the dissent fails to mention is that these were the only audible statements and occurred at a different time, in a different location, and where the actor in question was standing directly next to the patrol car and camera.

[2]The dissent focuses on the audibility of Kevin's "I have got a gun" statement on the video and alleges that we have found "as fact that this statement was made but was 'inaudible.'" We do not use the words "audible" or "inaudible" to make a factual finding of what was (or was not) said. Rather, we use those words for the limited purpose of describing exactly what statements and sounds the video recording picked up. The dissent opines that "it is unlikely that the victim ever said he had a gun;" this inference is unsupported by affirmative evidence outside the pleadings, and is insufficient to survive summary judgment. *See Celotex Corp.*, 477 U.S. at 324 (requiring a nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial").

reasonable inferences that could persuade "a reasonable jury [to] return a verdict for the nonmoving party," and find the officers' use of deadly force unconstitutional. *Liberty Lobby*, 477 U.S. at 248.

As such, the district court correctly concluded that Simmonds failed to "present evidence sufficient to create a genuine issue as to whether the defendant[s] . . . violated the law." *Metiva*, 31 F.3d at 386. Because Simmonds is unable to establish a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity," and we need not engage in *Saucier*'s second prong analysis of determining whether the violation of the constitutional right was clearly established. 533 U.S. at 201. The district court properly granted Comstock and Dirkse qualified immunity.

III.

The district court's grant of the Defendants' motions for summary judgment on the basis of qualified immunity is AFFIRMED.

———————

**DISSENT**

———————

MERRITT, Circuit Judge, dissenting.  The court predetermines the facts of this case by finding *as a fact* that Kevin Simmonds yelled, "I have a gun" and pointed a silver object out of the window as though he were firing a pistol at the five officers who had his truck blocked.  The court refers to the evidence as "the uncontested statement by Kevin that 'I have a gun'" and that he "brandished a weapon" (Opin. p. 12).  These so-called "facts" on which it upholds the summary judgment are very much contested by the parties.  They are the most crucial, contested facts in the case.

The police officers testified as a unit that they believed Kevin had a silver gun because he had his hands and arms extended in a firing position out of the driver's side of the truck and appeared to be pointing a shiny object at one of the officers.  They testified that, at that point, two of the officers immediately opened fire and killed Kevin.  The problem is, of course, there was no gun at all.  The officers and the court respond that Kevin must have been pointing his cell phone at them out of the window.  But this seems highly unlikely because the cell phone was found resting inside the truck on the seat, not where it would have dropped from Kevin's hands when he was killed.  At least one officer conceded that any weapon would likely have fallen onto the ground outside the driver's side door of Kevin's truck.  A neutral fact finder could easily find that there was no gun and no threat of deadly force.

As to the officers' claim that Kevin yelled, "I have got a gun," our court finds as fact that this statement was made but was "inaudible."  But two facts could easily lead a jury to find that the officers' claim is false and that its falsity completely undermines the defense.  First, the audio picked up clearly other sounds before, during, and after the shooting.  For example, the audio recorded the sound of Dirkse's voice yelling, "Show me your hands" four times and "Get out of the car."  After Kevin refused to comply and instead backed down the two-track, the police officers pulled up their cars within a few feet of Kevin's truck in order to block his escape.  A minute after Dirkse yells, "Show

me your hands" four times, we hear the sound of Dirkse leaving the car and cocking his shot gun once outside. Less than thirty seconds later we hear very distinctly the fourteen shots being fired at Kevin by the police officers a few feet away. Then, less than two minutes later, we hear the sound of a medical bag being knocked over when taken out of the police SUV that was parked immediately in front of Kevin's truck.

Based on the clarity of these other sounds, it is unlikely that the victim ever said he had a gun. But this issue is not for me to decide or for the court to decide because it is a classical example of a factual issue for the jury. Anyone who listens to the audio recording could certainly doubt that the officers are telling the truth. They may have simply invented a story in order to claim that they were in mortal danger. It would not be the first time police have invented such a defense. We should not just accept as gospel the word of witnesses who have a strong motivation to lie when other evidence calls their veracity into question. The question for the jury is whether the claimed "I have a gun" statement was "inaudible," as the majority argues, or simply "invented" falsely by the officers as a defense.

There is a second piece of evidence that weighs strongly against the majority's "inaudible" thesis. Officer Shanlian, a sixth officer, who remained back down the farm road near the Simmonds' home, some 400 feet away, testified that he also heard Kevin's "I have a gun" statement. Kevin's voice would have carried through trees at least the distance of a football field for Shanlian to hear it. If Kevin's voice was that loud, it seems highly unlikely that the statement could have been "inaudible." More likely, it was simply invented. Thus, I would reverse and remand the case for trial. Our Court's effort to predetermine the facts in favor of the officers and prevent a trial of the case is inconsistent with the Seventh Amendment and our long, common law tradition of calling on juries to resolve factual disputes. This principle is particularly important when an individual is killed by state officers and the issue is one of whether there was a gross abuse of governmental power. Judges, like others, are sometimes predisposed to believe what they want to believe, but we should resist that temptation here and let the jury decide after the parties have fully developed the case.

At present, the case remains a puzzle. Why did the police rush so quickly, aggressively, and impulsively to hem Kevin in, surrounding him like an animal with guns drawn? Why was his family back at his house not allowed to intervene to avoid such a confrontation? Were reasonable steps taken by the police to consider the situation carefully and avoid shooting a man who was perhaps mentally ill and, in fact, unarmed? These are relevant questions unmentioned by the majority that would be better considered by the jury after the full development of the case by competent counsel.