**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0385n.06

Nos. 11-3853, 11-3855, 11-3996

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Apr 17, 2013*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| NOEL MOTT, | ) |
| | ) |
|     Plaintiff-Appellee,   (11-3853, 11-3855) | ) |
|     Plaintiff-Appellant,  (11-3996) | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| v. | ) C O U R T   F O R   T H E |
| | ) NORTHERN DISTRICT OF |
| MATT MAYER; LARRY FAITH;    (11-3853) | ) OHIO |
| CHARLES METCALF,            (11-3855) | ) |
| | ) |
|     Defendants-Appellants, | ) |
|     Defendants-Appellees,     (11-3996) | ) |
| | ) |
| J. STEVEN SHELDON; RICHLAND COUNTY, | ) |
| OHIO; JERRELL BRAY, | ) |
| | ) |
|     Defendants. | ) |

Before: MARTIN, SUHRHEINRICH, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** In 2005, Noel Mott became a target of "Operation Turnaround," an investigation by the Richland County, Ohio Sheriff's Office ("RCSO") and the Drug Enforcement Administration ("DEA") to combat crack cocaine trafficking in the city of Mansfield and Richland County. He was indicted on drug-related charges and pled guilty. In 2007, the United States dismissed the charges against Mott and other defendants who were charged as a result of "Operation Turnaround" after it was discovered that Jerrell Bray, a confidential operative, had engaged in illegal conduct throughout the investigation.

Mott brought an action pursuant to 42 U.S.C. §§ 1983, 1985, and *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971), against state and federal officials, including Sergeant Matt Mayer, Captain Larry Faith, and Detective Charles Metcalf of the RCSO.[1] Mott asserted several claims: (1) false arrest, (2) malicious prosecution, (3) fabrication of evidence, (4) violations of his Fourth Amendment right to be free from unreasonable seizure, (5) a *Brady* violation based on the Fifth Amendment Due Process Clause, and (6) conspiracy to fabricate evidence and tamper with evidence in order to falsely arrest, detain, and charge Mott. The district court considered the defendants' motions for summary judgment on the basis of qualified immunity and made several rulings relevant to this appeal. The district court denied Mayer qualified immunity as to the fabrication of evidence claim and denied Faith and Metcalf qualified immunity as to the false arrest claim. It granted their motions with respect to all remaining claims.

Mott now appeals the district court's grant of qualified immunity to the defendants as to the malicious prosecution claim. Mayer and Faith jointly appeal the district court's denial of qualified immunity as to the fabrication of evidence and false arrest claims, respectively. Metcalf appeals the district court's denial of qualified immunity as to the false arrest claim. We reverse the district court's grant of summary judgment to the defendants as to the malicious prosecution claim and remand to the district court for further proceedings. We affirm the district court's denial of Mayer's, Faith's, and Metcalf's motions for summary judgment on the basis of qualified immunity.

---

[1]Mott reached a settlement agreement with the federal defendants and dismissed all claims against them. As a result, only Mayer, Faith, Metcalf, Bray, J. Steven Sheldon, and Richland County, Ohio, remain as defendants in this action.

**I.**

The RCSO launched what came to be known as "Operation Turnaround" after Timothy Harris's body was found in Richland County on December 31, 2004. Investigators believed that Harris's killing was related to drug trafficking. The RCSO asked Bray to make controlled buys of illegal drugs from individuals in the area in order to develop leads regarding Harris's death. In January 2005, the RCSO executed a Confidential Operative Agreement with Bray, who was to be supervised by Mayer and Metcalf. In August or September 2005, the DEA Task Force in Cleveland began to assist with the investigation. The DEA also entered into a Confidential Source Agreement with Bray, who was to be supervised by Special Agents Lee Lucas and Robert Cross.

Each controlled buy was supposed to proceed as follows. Bray and the RCSO officers would identify a target and inform the DEA agents, who would supply the buy money and travel from Cleveland to assist. Bray would place a phone call to the target. Investigators would search Bray and his vehicle before the buy and follow Bray to the location of the buy, attempting to view or record the transaction when possible. After the buy, they would follow Bray back to the sheriff's office, search Bray's person and vehicle, and take a statement from Bray.

**A.**

Several events occurred during Bray's relationship with the RCSO and the DEA that Mott argues demonstrate that Bray was not a reliable informant. He also argues that investigators erred by repeatedly failing to corroborate Bray's statements. We describe a few of the events referenced

by the district court in order to illustrate the conduct of Bray and the investigators during "Operation Turnaround."

On February 10, 2005, Metcalf asked Detective Dawn Brown, a detective with METRICH, a multi-county drug task force, to assist with a controlled buy that Bray was to make that day. Brown expressed concern that Bray, who was on parole after serving a prison sentence for involuntary manslaughter, was acting as a confidential operative without the consent of his parole officer. Bray nevertheless completed the buy. Brown's notes express several concerns about the way that the buy was conducted. Mayer and Metcalf did not know where Bray was during the transaction, and they did not follow Bray after the buy, even though they were responsible for monitoring him in order to ensure both the safety of the parties involved and the integrity of the evidence.

About a month later, Bray claimed that he purchased crack cocaine and a gun from Tyron Brown and Jason Westerfield in a controlled buy on March 12, 2005, and that he bought crack cocaine from Westerfield in a controlled buy on March 15, 2005. Mayer and Metcalf conducted surveillance on the March 15 transaction. In Mayer's report, he noted that Metcalf, who was familiar with Westerfield and knew what he looked like, "could see a visual on [Bray] and Jason Westerfield." Metcalf later testified that he saw Bray go into a house and saw Westerfield's car pull up to the house, but he did not know whether the man who got out of the car was Westerfield. Both Mayer and Metcalf knew that Westerfield was wearing a GPS issued by the Adult Parole Authority, and Mayer's report noted that they should check the GPS records to confirm his whereabouts at the time of the alleged drug sale. Mott argues that there is no evidence that Mayer and Metcalf checked

4

the GPS records, and Mayer and Metcalf do not dispute this. The GPS records would have revealed that Westerfield was not present at the location of either the March 12 or the March 15 buy.

On March 31, 2005, Bray's girlfriend told the RCSO that Bray had crack cocaine, which the RCSO had not authorized him to have, hidden in the steering wheel of his car. This violated Bray's Confidential Operative Agreement with the RCSO. He was arrested and charged with drug abuse and possession of drugs. Bray told Metcalf about the incident, offering conflicting explanations for the drugs, and asked Metcalf to help resolve the issue. The case was dismissed.

**B.**

Eventually, Mott was identified as a target of "Operation Turnaround." On September 6, 2005, Bray told investigators that he had arranged to buy drugs from Mott. They provided Bray with $2,800 in buy money and a recording device. Lucas, Metcalf, and Sheldon followed Bray as he picked up Jim Williams and proceeded to 435 Tremont Avenue, where Bray and Williams entered a residence. About half an hour later, Bray and Williams left. After Bray dropped Williams off, he proceeded to a pre-determined meet location and gave Lucas and Cross 72.2 gross grams of crack cocaine that Bray said he purchased from Mott inside the residence for $750. The transaction was recorded, but there is nothing in the record indicating that investigators attempted to verify the identity of the drug seller on the recording. During a proffer interview after Mott's indictment, another target of "Operation Turnaround," Rico Spires, identified the seller on the recording as Darren Transou, who lived at 435 Tremont Avenue. Spires said Mott was not involved in the drug buy.

5

Also on September 6, Bray told the investigators that Mott had asked Bray to drive him to Detroit to purchase more cocaine. Bray said that Mott planned to spend $36,000 on drugs and wanted to leave the next morning. The investigators planned to have Bray, who would be wired with a recording device, drive Mott and Spires to Detroit and to have a trooper pull over their vehicle on the way, giving investigators an opportunity to seize the drug money. On September 7, Mayer and Special Deputy Wayne Legitt followed Bray, whose vehicle Metcalf was tracking using GPS, to 435 Tremont Avenue, which is referred to as "Mott's residence" in Lucas's report. Bray claimed that when he got to the residence, he was told to meet Mott and Spires at a gas station and to follow them to Detroit instead of driving them in his car. Bray went to the gas station, where he met Transou and another woman. According to Lucas's report, Bray told investigators that he was instructed to follow Transou, who was driving a 1996 Ford Bronco, because Mott and Spires had already left. A METRICH officer's report indicates that investigators did not know that Mott was not in the Bronco until it was pulled over. The Bronco was searched, but no drugs or money were found.

On September 15, 2005, Bray told investigators that he had arranged to buy more crack cocaine from Mott. Bray said that he set up the buy by calling Mott at a cell phone number, which Spires later told investigators was Transou's number, not Mott's number. Investigators gave Bray $2,400 and a recording device, which Faith was monitoring. Lucas and Mayer followed Bray to a market, where he met a man whom he identified as Mott in the parking lot. Then they followed Bray and "Mott" to 435 Tremont Avenue. "Mott" went into the residence and returned with another man. The man handed "Mott" 81.4 gross grams of crack cocaine, and Bray gave "Mott" $1,620 for the drugs. Bray hid the remaining $780 in buy money behind the radio in his car. In a conversation that

6

was captured on Bray's recording device, Bray told the investigators that Mott wanted more than $2,400 and that Bray threw in $20 of his own money to make sure that the deal did not "go sour." Back at the sheriff's office, investigators searched Bray's car and found the $780 hidden behind the radio. Bray told the investigators, "That's the rest of ya'll money right there," explained that he hid the money because he did not want to be robbed, and admitted that he actually gave Mott $1,620. In Lucas's report regarding the incident, he stated that Bray returned the remaining $780 but did not mention Bray's initial lie about how much he paid for the drugs or how the money was discovered in Bray's car. Bray continued to work as a confidential informant and suffered no negative consequences from the incident.

## C.

On November 8, 2005, Lucas testified before a grand jury regarding "Operation Turnaround." He described Mott as "one of the larger drug dealers" from Detroit. Lucas testified that Bray purchased 27.6 grams of cocaine from Mott on September 6, 2005. He also testified that investigators followed Mott and two other men in a Bronco on September 8.[2] Finally, Lucas said that Bray bought 50.8 grams of crack cocaine from Mott on September 15, 2005.

The grand jury issued an indictment on November 9, 2005. Count One charged Mott with conspiring to possess with intent to distribute and to distribute fifty grams or more of crack cocaine

---

[2]It is unclear whether Lucas was referring to the September 7 incident in which officers pulled over the Bronco on the way to Detroit or another separate incident on September 8.

7

from winter 2005 to November 2005 with nineteen other indicted persons.[3]  Count Fifteen charged

Mott with knowingly and intentionally distributing five grams or more of crack cocaine, in

connection with Bray's alleged drug buy on September 6.  Count Twenty-Two charged Mott with

knowingly and intentionally distributing fifty grams or more of crack cocaine, in connection with

Bray's alleged drug buy on September 15.

Mott was arrested on November 10, 2005, by Lucas, Cross, Metcalf, and Faith.  Lucas

advised Mott of his Miranda rights, and Mott said that he wanted to make a statement.  Mott

admitted to selling and transporting crack cocaine in Mansfield for Damadre Brooks but claimed that

he was a middleman who made only a few hundred dollars.  Mott denied having any connections to

large-scale dealers in Mansfield and denied transporting kilos of cocaine to Mansfield from Detroit.

Mott said that most of the people who sold large amounts of drugs in Mansfield were supplied "by

a guy named 'Unc,'" who investigators identified as James Burton.  Mott told investigators that Unc

supplied Mott's girlfriend's brother, Joe Ward, and her mother, Johnie Parker, and that Unc met with

Ward, Albert Lee, and others to discuss their crack cocaine business.

On March 15, 2006, a grand jury issued a superseding indictment, charging Mott with

essentially the same misconduct as the original indictment.[4]  On May 2, 2006, Cross and Special

Agent Joseph Harper interviewed Mott.  Mott explicitly denied selling Bray crack cocaine on

---

[3]The superseding indictment corrected the dates in the original indictment, alleging that the conspiracy took place between winter of 2004 and November 2005.

[4]Count One of the superseding indictment alleged that the conspiracy took place between winter of 2004 and November 2005.  Mott's alleged drug sale on September 15, 2005, was charged in Count Twenty-Four instead of Count Twenty-Two.

September 6, 2005, and September 15, 2005.  He admitted to being present at the 435 Tremont

Avenue residence on September 6 when Bray was there but stated that both he and Bray purchased

crack cocaine from Williams.  Mott said that Williams was his main source of narcotics but that he

also bought marijuana from Spires on several occasions.  Mott stated that he bought cocaine from

"Cheese" and crack cocaine from Bray, Deondray Bradley, and, on one occasion, from Freddie

Parker, Johnie Parker's husband.  Mott also told investigators that he sold narcotics at a house off

Diamond Street with Freddie Parker or at a trailer park off Ashland Road.

Mott pled guilty to Count One of the superseding indictment on May 24, 2006.  The charges

regarding the alleged drug buys on September 6 and September 15 were dismissed.  Mott also pled

guilty on August 29, 2006, to distributing cocaine base while he was out on bail.  He was sentenced

to a term of fifty-one months' imprisonment on Count One and forty-six months' imprisonment on

the distribution charge, to run concurrently.

**D.**

On December 20, 2007, Bray pled guilty to two counts of perjury and five counts of

deprivation of civil rights as a result of his conduct during "Operation Turnaround."  Shortly

thereafter, the government filed a motion for leave of court to dismiss the charges against Mott and

other "Operation Turnaround" defendants.  The government acknowledged that "Bray was an

essential witness to the charges" to which the defendants pled guilty or were convicted and that

"Bray's illegal conduct was so pervasive and his credibility so tainted by his guilty plea" that the

defendants were entitled to new trials or to withdraw their guilty pleas.  The district court withdrew

the defendants' guilty pleas, vacated their convictions and sentences, and dismissed the charges against them on January 25, 2008.

**E.**

On January 22, 2010, Mott filed suit against state and federal officials in the Northern District of Ohio. The defendants moved for summary judgment on the basis of qualified immunity. The district court issued an order regarding the defendants' motions on July 15, 2011. It denied Lucas, Faith, Metcalf, and Cross qualified immunity as to Mott's false arrest claim. It denied Lucas and Mayer qualified immunity as to the fabrication of evidence claim. It granted qualified immunity to Lucas, Faith, Metcalf, Mayer, and Cross as to all remaining claims. The district court also granted qualified immunity to Sheldon, Karen P. Tandy, Anthony C. Marotta, Robert L. Corso, John Ferester, Jamaal Ansari, and Thomas Verihiley.

On July 25, 2011, Mott filed a motion asking the district court to reconsider its dismissal of his malicious prosecution claim or, in the alternative, to grant him permission to appeal pursuant to Federal Rule of Civil Procedure 54(b). The district court denied Mott's motion for reconsideration but granted his motion for a certification of leave to appeal the dismissal of the malicious prosecution claim. The district court entered final judgment for the defendants on the claim and stayed further proceedings pending the resolution of Mott's appeal and Mayer's, Faith's, and Metcalf's qualified immunity appeals.

Several months later, Mott reached a settlement agreement with the federal defendants and agreed to dismiss with prejudice all claims against them. On February 8, 2012, the district court

approved the partial dismissal. As a result, only Mayer, Faith, Metcalf, Bray, Sheldon, and Richland

County, Ohio, remain as defendants in this action.

**II.**

This court has jurisdiction to consider the parties' appeals. We consider Mott's appeal

pursuant to Federal Rule of Civil Procedure 54(b), which permits a district court to "certify a partial

grant of summary judgment for immediate appeal 'if the court expressly determines that there is no

just reason for delay.'" *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 500 (6th

Cir. 2012) (quoting Fed. R. Civ. P. 54(b)). Mayer's, Faith's, and Metcalf's appeals of the district

court's denials of qualified immunity are interlocutory appeals that we hear as final decisions of the

district court pursuant to the "collateral order" doctrine. *Gregory v. City of Louisville*, 444 F.3d 725,

742 (6th Cir. 2006).

We review a district court's grant or denial of summary judgment on the basis of qualified

immunity *de novo*. *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 444 (6th Cir. 2012); *Walker v. Davis*,

649 F.3d 502, 503 (6th Cir. 2011). Summary judgment is proper where no genuine issue of material

fact exists and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a). In

considering a motion for summary judgment, we construe all reasonable inferences in favor of the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Qualified immunity protects government officials from liability "when a reasonable official

in the defendant's position would not have understood his or her actions to violate a person's

constitutional rights." *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007). "Under the

doctrine of qualified immunity, 'government officials performing discretionary functions[] generally

11

are shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'" *Id.*

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In *Saucier v. Katz*, the Supreme Court established a two-step inquiry for determining

whether an official is entitled to qualified immunity. 533 U.S. 194, 201 (2001). We must consider

(1) whether, viewing the evidence in the light most favorable to the injured party, a constitutional

right has been violated; and (2) whether that right was clearly established.[5] *Id.* In *Pearson v.*

*Callahan*, the Supreme Court held that while the sequence set forth in *Katz* is often appropriate, it

is not mandatory, and courts have discretion to decide which of the two prongs of the qualified

immunity analysis to address first. 555 U.S. 223, 236 (2009).

Once a defendant raises the qualified immunity defense, the burden is on the plaintiff to

demonstrate that the official is not entitled to qualified immunity by alleging facts sufficient to show

that the official's act violated clearly established law at the time that it was committed. *Simmonds*,

682 F.3d at 444. "To defeat the qualified immunity bar, a plaintiff 'must present evidence sufficient

to create a genuine issue as to whether the defendant committed the acts that violated the law.'" *Id.*

(quoting *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994)). "To make out a *genuine* issue of

---

[5]Some panels of this court have employed a three-step qualified immunity analysis, asking, in addition to the *Katz* questions, "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005) (internal quotation marks omitted). "[T]he three-step approach may in some cases increase the clarity of the proper analysis," but "[i]n many factual contexts . . . , including this one, the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable." *Id.*

material fact, plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her." *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009).

**III.**

We consider Mott's appeal first. Mott argues that the district court erroneously concluded that the defendants had probable cause to prosecute him, and, therefore, that Mott did not meet his burden of producing evidence that his constitutional right was violated. Mott contends that the district court committed three errors: (1) it failed to ask whether there was probable cause to prosecute him for the particular offenses with which he was charged; (2) it held that Mott's post-arrest statement could supply probable cause for his indictment, which pre-dated his arrest; and (3) it erroneously concluded that the substance of his post-arrest statement supported the charges against him.

This court recognizes a "'constitutionally cognizable claim of malicious prosecution under the Fourth Amendment'" encompassing "wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006) (quoting *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003)). "The 'tort of malicious prosecution' is 'entirely distinct' from that of false arrest, as the malicious-prosecution tort 'remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process.'" *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Wallace v. Kato*, 549 U.S. 384, 390 (2007)). The elements of a malicious prosecution claim under § 1983 when the claim is premised on a violation of the Fourth Amendment are as follows:

13

> First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute. Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution. Third, the plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure. Fourth, the criminal proceeding must have been resolved in the plaintiff's favor.

*Id.* at 308-09 (internal quotation marks, citations, and alterations omitted).

Probable cause to initiate a criminal prosecution exists where "facts and circumstances [are] sufficient to lead an ordinarily prudent person to believe the accused [is] guilty of the crime charged." *MacDermid v. Discover Fin. Servs.*, 342 F. App'x 138, 146 (6th Cir. 2009) (internal quotation marks omitted); *see also Cervantes v. Jones*, 188 F.3d 805, 811 (7th Cir. 1999) ("Probable cause means the existence of such facts and circumstances as would excite the belief, in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." ) (internal quotation marks omitted), *overruled on other grounds by Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001). As a general rule, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." *Barnes*, 449 F.3d at 716. However, an exception applies "where the indictment was obtained wrongfully by defendant police officers who knowingly present[ed] false testimony to the grand jury." *Cook v. McPherson*, 273 F. App'x 421, 424 (6th Cir. 2008); *see also Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007) (observing that a judicial determination of probable cause has no preclusive effect if a claim of malicious prosecution is based on a police officer's supplying false information to establish probable cause).

14

The district court concluded that the grand jury's indictment did not establish probable cause for Mott's arrest because it was based on false testimony by Lucas. The district court observed that Lucas's testimony was based entirely upon unreliable, uncorroborated information from Bray and that several of Lucas's statements were misleading or false. Nonetheless, the district court held that there was probable cause to prosecute Mott based on his post-arrest statement to investigators that he was involved in drug trafficking. Therefore, the district court concluded that Mott did not meet his burden of producing evidence that his constitutional right was violated and that the defendants are entitled to qualified immunity as to Mott's malicious prosecution claim.

Mott first argues that the district court erred by failing to ask whether there was probable cause to prosecute him for the *particular offenses* with which he was charged. He contends that the probable cause inquiry differs in the context of an arrest and in the context of a decision to charge or prosecute. Mott is correct. Whether probable cause exists to arrest a suspect is a distinct question from whether probable cause exists to prosecute an accused. *See Sykes*, 625 F.3d at 310-11 ("In order to distinguish appropriately [the claim of malicious prosecution] from one of false arrest, we must consider not only whether the Defendants had probable cause to arrest the Plaintiffs but also whether probable cause existed to initiate the criminal proceeding against the Plaintiffs."). Probable cause to make an arrest exists when "the facts and circumstances known to the officer warrant a prudent man in believing that *an offense* has been committed." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 248 (6th Cir. 2010) (internal quotation marks omitted) (emphasis added). Probable cause to prosecute exists when the facts and circumstances are sufficient to lead a reasonable person to believe that the accused committed *the particular offense* with which he is to be charged. *See, e.g.*,

15

*McKinley v. City of Mansfield*, 404 F.3d 418, 445 (6th Cir. 2005) (affirming the district court's dismissal of the plaintiff's malicious prosecution claim because, at the time the plaintiff was charged, authorities had unchallenged evidence that the plaintiff committed the crimes of which he was accused).

In the district court's discussion of Mott's malicious prosecution claim, it cited *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000), which discussed probable cause in the context of arrest. The district court concluded that the defendants had probable cause to prosecute Mott because his post-arrest statement provided "reasonably trustworthy information sufficient to warrant a prudent person in believing that Plaintiff had committed or was committing an offense." The district court observed that Mott's post-arrest statement "gave Defendants reasonable belief he had committed a crime in general, and, specifically, was in some way involved in the drug trade in Mansfield with individuals from Detroit." The district court erred by failing to ask whether there was probable cause to prosecute Mott for the *three specific crimes* with which he was charged.

Mott also argues that his post-arrest statement could not have provided probable cause to initiate the criminal proceeding against him. The tort of malicious prosecution remedies the "'*wrongful institution* of legal process.'" *Sykes*, 625 F.3d at 308 (quoting *Wallace*, 549 U.S. at 390); *Palshook v. Jarrett*, 32 F. App'x 732, 735 (6th Cir. 2002) ("The tort of malicious prosecution makes liable those who actively initiate and pursue the unwarranted prosecution of a plaintiff."). Authorities must have probable cause to initiate a criminal proceeding against a suspect at the time it is commenced. *See Hartman v. Moore*, 547 U.S. 250, 258 (2006) (observing that in a malicious prosecution action, "a plaintiff must show that the criminal action was begun without probable cause

16

for charging the crime in the first place"); *Sykes*, 625 F.3d at 310-11 (looking at "the totality of the circumstances at the time of the Plaintiffs' arrest and through the time that the criminal proceeding against them commenced" to determine whether there was probable cause to prosecute them). Authorities may not charge a suspect first and develop probable cause later.

In this case, authorities made the decision to charge Mott and the grand jury indicted him before he spoke with investigators. Thus, Mott's post-arrest statement could not have provided probable cause for the charges in the grand jury's indictment. This is not to say, however, that Mott's post-arrest statement could not have supplied probable cause for future charges. Here, the superseding indictment, which was issued after Mott's post-arrest statement, charged him with the same offenses as the original indictment. As we discuss next, there is a genuine issue of material fact as to whether the content of Mott's statement supports the charges in the indictment and superseding indictment. Therefore, the district court clearly erred by finding that Mott's post-arrest statement supplied probable cause for his initial indictment, and it also may have erred by finding that it provided probable cause for the charges in the superseding indictment.

Mott contends that neither his post-arrest statement nor his May 2006 proffer interview provided probable cause to prosecute him for the crimes with which he was charged. During his post-arrest statement, Mott did not discuss his alleged crack cocaine sales to Bray on September 6, 2005 or September 15, 2005. During his proffer interview, Mott explicitly denied selling drugs to Bray on those dates. Thus, Mott argues that his statements did not provide probable cause for the two distribution charges based on these alleged drug sales. Similarly, Mott argues that his statements did not demonstrate that he participated in the conspiracy to possess with intent to distribute crack

17

cocaine charged in Count One of the indictment and superseding indictment. During Mott's post-arrest statement, he admitted to selling crack cocaine in Mansfield for Damadre Brooks. During Mott's proffer interview, he told investigators that he sold narcotics at a house off Diamond Street with Freddie Parker or at a trailer park off Ashland Road. However, neither Brooks nor Freddie Parker is a person with whom Mott was accused of conspiring. Mott said during his post-arrest statement and proffer interview that he was familiar with Burton, Ward, Johnie Parker, Lee, Williams, and Spires, all of whom were charged as co-conspirators, and that he purchased drugs from some of them. Mott argues that while his statements indicate that he knew some of the people involved in the conspiracy, he never admitted to selling drugs with them, much less in the quantities and during the time period alleged in Count One.

Because the district court failed to ask whether there was probable cause to prosecute Mott for the three specific crimes with which he was charged, it failed to recognize that Mott presents enough evidence to establish a genuine issue of material fact as to the second element of his malicious prosecution claim. We may reverse a district court's grant of qualified immunity to defendants on interlocutory appeal where fundamental factual disputes preclude summary judgment. *See Huckaby v. Priest*, 636 F.3d 211, 216-17 (6th Cir. 2011) (reversing the district court's grant of summary judgment to the defendants where the district court improperly interpreted factual issues in the light most favorable to the defendants and discounted the plaintiffs' evidence demonstrating a factual dispute). The district court improperly granted summary judgment to the defendants on the ground that Mott could not meet the second element of his claim, and, therefore, we reverse. However, we note that Mott must demonstrate a genuine issue of material fact as to the first, third,

and fourth elements of a malicious prosecution claim in order to prevail against the defendants' qualified immunity defense. We remand to the district court so that it may consider whether Mott demonstrates a genuine issue of material fact as to all the elements of his claim, thereby precluding a grant of qualified immunity to the defendants.

## IV.

Next , we consider the sole issue that Mayer and Faith raise on appeal, which Metcalf also raises. Mayer, Faith, and Metcalf argue that the district court effectively ruled against them on the merits in the process of denying their motions for summary judgment on the basis of qualified immunity. They point to language in the opinion "that is strikingly final" and argue that the district court improperly denied them qualified immunity "as a matter of law."[6] They contend that "the district court's factual and legal conclusions effectively deny [them] the opportunity to challenge the merits of Mott's claims, whether at trial or in a future motion for summary judgment" and that the district court, in effect, entered summary judgment *sua sponte* in favor of Mott. Mott agrees that the district court "essentially entered judgment" against the defendants but argues that the district court did not abuse its discretion by granting summary judgment in his favor.

---

[6]The district court denied Lucas, Faith, and Metcalf qualified immunity as to Mott's false arrest claim "as a matter of law" and denied Cross qualified immunity "due to the presence of a genuine issue of material fact." The district court denied Lucas qualified immunity as to the fabrication of evidence claim "as a matter of law" and denied Mayer qualified immunity "due to the presence of a genuine issue of material fact."

Qualified immunity "is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Mitchell v. Forsyth*, 472 U.S. 511, 527-28 (1985); *Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005). Qualified immunity "is an *immunity from suit* rather than a mere defense to liability." *Mitchell*, 472 U.S. at 526. It is "part [of] an entitlement not to be forced to litigate the consequences of official conduct." *Id.* at 527. As a result, "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Katz*, 553 U.S. at 200; *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."). When a defendant raises the qualified immunity defense, the burden is on the plaintiff to demonstrate that the defendant is not entitled to qualified immunity by alleging facts sufficient to show that the defendant's act violated clearly established law at the time that it was committed. *Simmonds*, 682 F.3d at 444. "To defeat the qualified immunity bar, a plaintiff 'must present evidence sufficient to create a genuine issue as to whether the defendant committed the acts that violated the law.'" *Id.* (quoting *Adams*, 31 F.3d at 386).

When the district court considered the defendants' motions for summary judgment on the basis of qualified immunity, it only needed to resolve the narrow issue of whether Mott presented evidence sufficient to create a genuine issue as to whether the defendants violated his clearly established rights. Nonetheless, some of the language in the district court's opinion suggests that the district court made factual findings and reached conclusions of law with respect to Mott's substantive claims in the process of ruling on qualified immunity. For example, the district court

found in its discussion of Mott's false arrest claim that both Faith and Metcalf "knew Bray was unreliable" and "knew the extent to which the investigation relied upon Bray." Therefore, they "knew the warrant was based upon false or misleading statements, rendering the warrant invalid and the arrest based upon that warrant unlawful." The district court concluded that "Metcalf and Faith unlawfully arrested Plaintiff in violation of Plaintiff's constitutional right."

To the extent that the district court passed judgment on the merits of Mott's claims, this was improper. Prior to discovery, the parties were directed to file motions for summary judgment based on qualified immunity alone. Neither the defendants nor Mott sought summary judgment on the merits of Mott's claims. At this stage in the proceedings, Mayer, Faith, and Metcalf had no burden to produce evidence sufficient to disprove Mott's claims. They simply needed to invoke the qualified immunity defense, at which point Mott had the burden of producing evidence sufficient to create a genuine issue of material fact as to whether the defendants violated his clearly established rights.

The fact remains, however, that while the district court denied the defendants qualified immunity, it did not enter summary judgment in Mott's favor on the false arrest or fabrication of evidence claims. Thus, there is no ruling in Mott's favor for this court to overturn. When the district court approved the dismissal of Mott's claims against the federal defendants, the district court's last significant action in this case, it acknowledged that claims remain pending against Mayer, Faith, and Metcalf. While Mayer, Faith, and Metcalf are not entitled to qualified immunity at this stage, they may raise this argument again in future motions for summary judgment or as an affirmative defense at trial. They remain free to attack Mott's claims on the merits. We affirm the district court's denial

21

of qualified immunity to Mayer, Faith, and Metcalf, but we emphasize that, notwithstanding some of the language in the district court's opinion, the defendants may raise the qualified immunity defense and contest their liability as the proceedings continue.

## V.

Finally, we turn to Metcalf's argument that the evidence does not support a finding that he falsely arrested Mott. Metcalf contends that, among other things: (1) he did not know that Lucas testified falsely before the grand jury; (2) he was unaware of Bray's misconduct; (3) he did not participate in Bray's alleged drug buy from Mott on September 15, 2005; and (4) investigators corroborated Bray's information by monitoring his drug buys.

A defendant who appeals a denial of qualified immunity "should be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the case." *Berryman v. Rieger*, 150 F.3d 561, 564 (6th Cir. 1998). "Once a defendant's argument drifts from the purely legal into the factual realm and begins contesting what really happened, our jurisdiction ends and the case should proceed to trial." *Id.* at 564-65. The district court recognized that Mott presented evidence creating a genuine issue of material fact as to whether Metcalf violated Mott's clearly established constitutional rights. Metcalf ignores the evidence presented by Mott and instead emphasizes facts that he argues are favorable to him. We lack jurisdiction to decide factual disputes on interlocutory appeal. *Id.* Therefore, we dismiss Metcalf's appeal to the extent it is based on an argument that the evidence does not support a finding of false arrest.

## VI.

For these reasons, we reverse the district court's grant of summary judgment to the defendants as to the malicious prosecution claim and remand to the district court for further proceedings. We affirm the district court's denial of Mayer's and Faith's motions for summary judgment on the basis of qualified immunity. We dismiss Metcalf's challenge to the district court's denial of qualified immunity for lack of jurisdiction.