NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0799n.06

No. 12-4429

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JENNIFER LEECH, et al.,               )
                                      )
     Plaintiffs-Appellants,          )
                                      )
v.                                    )
                                      )     ON APPEAL FROM THE UNITED
JOHN MAYER, et al.,                   )     STATES DISTRICT COURT FOR THE
                                      )     NORTHERN DISTRICT OF OHIO
     Defendants-Appellees.           )
                                      )
                                      )

FILED
Oct 22, 2014
DEBORAH S. HUNT, Clerk

BEFORE: COLE, Chief Judge; DAUGHTREY and WHITE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Following plaintiff Edwin Griffeth's arrest and incarceration for violating conditions of his "release supervision," Griffeth and co-plaintiff Jennifer Leech filed suit against 27 officials and agencies of the State of Ohio, alleging, among other claims, that those defendants conspired to deprive Griffeth and Leech of rights guaranteed them under the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution. Through the course of the ensuing litigation, a number of those claims and defendants were dismissed voluntarily by the parties, and the district court granted dispositive motions in favor of other defendants. On appeal, the plaintiffs now contest only two of those district court's orders: one that granted qualified immunity to defendant John Mayer on numerous conspiracy claims and allegations premised upon the provisions of 42 U.S.C. § 1983; and a second order that granted a motion to dismiss § 1983 claims by the plaintiffs against

1

defendants Lee Sampson, Ron Nelson, Russell Daubenspeck, Dave Lomax, and Lazarus Todd. For the reasons discussed below, we reject the arguments put forth by Leech and Griffeth and affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

In order to place the actions of the parties to this appeal in the proper context, it is necessary to recap events dating back as far as May 2004. At that time, a high-school student, less than two weeks shy of her eighteenth birthday, attended a party hosted by Alex Griffeth, plaintiff Edwin Griffeth's son. Edwin was also present at the party, and at some point during the evening, he invited the female student to share a special stash of "really good marijuana" with him. After taking three bong hits with Edwin, "things became blurry" for the young woman due, she believed, to the fact that she had ingested marijuana previously that evening and also had consumed five beers. The next thing she remembered, Edwin Griffeth had removed her pants and underwear and had inserted his penis into her vagina.

Approximately three weeks later, on June 5, 2004, Alex Griffeth hosted another party, this time to celebrate his high-school graduation. The partygoers again participated in beer-drinking and marijuana-smoking. One of the guests at the party, an 18-year-old female, admitted that, after consuming two-and-a-half beers and taking two hits of marijuana, she engaged in consensual intercourse with Alex Griffeth in the Griffeth home. Not feeling well, however, she remained in the bedroom and fell asleep after Alex rejoined the party. Sometime later, she awoke to find herself naked, with plaintiff Edwin Griffeth on top of her, raping her vaginally.

Following the report of these two sexual assaults, criminal prosecution ensued, Edwin Griffeth pleaded guilty in Ohio state court to two counts of sexual battery, and he was sentenced

2

by Common Pleas Court Judge James DeWeese on October 4, 2004, to four years in state prison. Incarceration was to be followed by five years of "community control" overseen by the Ohio Adult Parole Authority (OAPA). On November 7, 2006, however, after serving only two years of his four-year prison term, Griffeth was granted "judicial release" by Judge DeWeese and was ordered to begin his five-year parole stint.

Before beginning his period of supervision, Griffeth signed and dated documents that indicated his agreement to abide by certain "Special Conditions of Supervision" and "Sex Offender Special Conditions." Among the relevant restrictions on the plaintiff's liberty, Griffeth agreed to:

> Secure written permission of the supervising officer before leaving the county of residence.
>
> Maintain a 10:00 P.M. to 5:00 A.M. curfew in [his] residence, unless [he] obtained written permission from [his] probation/parole officer.
>
> [N]ot possess, own, use, or have under [his] control a police scanner, pager device, cellular telephone or two-way radios.
>
> [N]ot form a relationship with a man or woman who has physical custody of children without the knowledge and permission of [his] supervising officer.
>
> [N]ot drive or ride in a motor vehicle with females without the knowledge and permission of [his] supervising officer.

At the time that Griffeth was released from prison, defendant John Mayer served as a supervisor of the Mansfield Unit of the OAPA. In that capacity, however, Mayer was not directly responsible for Griffeth's supervision. In fact, Mayer's supervision of Griffeth would have involved an improper conflict of interest due to the fact that Griffeth had developed a personal relationship with Mayer's ex-wife, plaintiff Jennifer Leech.

Indeed, the appellate record indicates that Leech and Griffeth first met in 2004 when Leech, then still single, purchased a car from Griffeth's family's automobile dealership. According to Leech, the two became friends and, on one Fourth of July, accompanied each other to dinner and a fireworks display. Leech initially kept in contact with Griffeth through letters and phone calls while he was in prison, but she eventually broke off the relationship because "[she] was just uncomfortable with it. [She] didn't see the sense in continuing a relationship at that point."

In June 2007, Leech married defendant Mayer, but the union "was very rocky from . . . the day before the wedding." By April 2008, the couple had separated, and on August 18, 2008, Leech was granted a divorce from Mayer. As part of that divorce decree, both Leech and Mayer were "permanently mutual[ly] enjoined and restrained from bothering, harassing or annoying the other."

According to testimony provided by Leech at an administrative hearing, however, Mayer failed to keep up his end of that bargain. Plaintiff Leech asserted that Mayer continued to send her letters, make telephone calls to her, follow her around town, and "coincidentally" cross paths with her every morning and every afternoon. In fact, the alleged stalking and harassment became so bad that Leech contacted the Mansfield Police Department to complain. The police apparently telephoned Mayer and told him to cease contacts with his ex-wife. Mayer's employer, the OAPA, also ordered him not to contact Leech.

Around that same time period, Leech and Griffeth rekindled their friendship. Although both plaintiffs claimed that their relationship was not romantic in nature, Mayer obviously thought differently. Those suspicions were heightened in early August 2008, prior to the

4

finalization of Mayer's and Leech's divorce, when Leech accompanied Griffeth on a trip to Florida.

Although Griffeth had obtained permission from his parole officer, defendant Daubenspeck, to take a nine-day trip to Clearwater, Florida, with his mother in order to "visit/repair property," it became clear that Leech, not Griffeth's mother, actually traveled with plaintiff Griffeth. Nevertheless, Leech explained that she and Griffeth only flew to Florida and back together, and did not see each other at all in Florida, other than at the airport.

Further tension between Leech and Mayer surfaced when the couple's divorce became final and Mayer asked Leech to return a service firearm he had given her previously for her protection. Leech did not return the gun immediately because she had given it to her brother in exchange for a smaller, more manageable firearm. Consequently, Mayer enlisted the assistance of a Richland County assistant prosecutor who informed Leech, through Leech's attorney, that felony charges would be sought if the weapon was not returned. In the end, the gun was returned to Mayer.

Mayer, convinced that Leech was having an affair with Griffeth, continued to follow his ex-wife as she drove around town. Then, on November 20, 2008, Mayer drove by Leech's home at approximately 5:00 a.m. and claimed to have observed Griffeth's car parked outside the residence. Had Griffeth in fact been at Leech's home at that hour, he would have been in violation of his curfew restrictions, as well as other conditions of his supervised release from incarceration. Leech nevertheless vehemently denied that Griffeth spent the night at her house on November 19, 2008, or that Griffeth's car was parked in front of her home at 5:00 a.m. on November 20, 2008.

5

In any event, Mayer became increasingly distraught throughout the day at the idea that his ex-wife was friendly with a convicted sex offender and even asked his employer if he could use accrued vacation time rather than completing his normal work day. In an incident report filed the following day, Mayer described some of the pertinent events of the evening of November 20, 2008, after he left work early:

> At approximately 5:00 PM, I met Richland County Probation Chief Dave Leitenberger for drinks at the Red Fox on Marion Avenue. I had approximately 4 beers and stopped drinking at 6:00 PM. I then went back to my house and then left at 7:00 PM, driving around the countryside due to being stressed, and knowing that I had observed the offender's vehicle at my ex-wife's house. At approximately 8:30 PM, I drove by the offender's residence at 424 Vanderbilt Road, Mansfield, Ohio. By driving by his house, I saw him in his car, along with my ex-wife sitting in the passenger seat. I got out of my car to stop him and to tell him that he is not to have any contact with my ex-wife. It should be noted that he did not stop but accelerated and I had to move out of the way. He could have possibly hit me with his car. He then traveled to S.R. 13 and I follow[ed] him. I called the Richland County Sheriff's Department and explained that I had a sex offender that I wanted stopped who was in his vehicle. Offender Griffeth, who was driving, circled back around to his house and I followed behind him. I got out of the car, so did the offender and my ex-wife. I told the offender that he was not authorized to be over at my ex-wife's home this same morning around 5:00 AM, which is in violation of his conditions of supervision. At this time, the Bellville Police and State Highway Patrol pulled up and told him that he was in violation of his supervision for having unauthorized contact with my ex-wife and her daughter. I know that P.O. Daubenspeck did not give the offender permission to be out past curfew and to be at my ex-wife's house. The offender also did not stop his vehicle and I had to move out of the way so I would not be hit. The Bellville police officer arrested the offender and took him to the Richland County Jail.

Not surprisingly, the plaintiffs had a slightly different take on the professionalism, or lack thereof, displayed by Mayer that evening. Leech explained that Mayer did indeed follow the vehicle that Griffeth was driving and in which she was a passenger. She claimed though that Mayer drove so close to their rear bumper that they could not see the front end of his vehicle, no "matter how fast or how slow [they] went." Eventually, Griffeth pulled into the driveway of

Griffeth's mother's home, which was located next door to Griffeth's own residence. Mayer parked his vehicle so as to block egress from the driveway, exited his car, and approached Griffeth, yelling, "I'm going to get you now, you son-of-a-bitch." According to Leech, Mayer then screamed violently at her that she had ruined his life and embarrassed their families by choosing "a sex offender over him." She also claimed that she detected the odor of alcohol on Mayer at that time, and Griffeth testified at a subsequent hearing that Mayer "stunk like booze."

When uniformed police officers arrived on the scene, Mayer confiscated Griffeth's cell phone and Griffeth was transported to the local jail. Approximately 45 minutes later, sometime between 10:00 and 10:30 p.m., Mayer appeared at the jail with the paperwork necessary to hold Griffeth in custody on the alleged probation violations. At that time, Sergeant James Sweat of the Richland County Sheriff's Office spoke with Mayer about the incidents of that evening and made the following observations about the probation officer:

> As we talked, it was obvious that P.O. Mayer had been consuming alcohol. He had a strong odor of alcohol about his person and breath. His eyes were bloodshot and glassy. He was upset.

* * * * *

> [H]e was obviously intoxicated, under the influence of alcohol, a strong odor of alcohol. It wasn't just fresh alcohol odor. It was an older odor of alcohol and it appeared to be consistent with liquor, not beer.

> As I said, his words were every now and then slightly slurred. His eyes were bloodshot and glassy. I don't think that he was intoxicated to the point where he couldn't walk or talk, but he was definitely beyond that of operating a motor vehicle in my opinion or being out walking down the street by himself.

Consequently, Sweat informed Mayer that he would not be able to drive himself home. Mayer, despite denying that he was intoxicated, then called an acquaintance who arrived at the station and departed with him.

At approximately 11:30 p.m. on November 20, 2008, Leech received a phone call originating from Edwin Griffeth's cell phone. When she answered, however, Mayer was on the other end exclaiming again, "I cannot believe you chose a sex offender over me. That's a really good role model for [my daughter] Demi." Before 8:00 a.m. the following morning, Leech received another phone call from Mayer, this one from Mayer's own phone. Once again, Mayer berated Leech for choosing a sex offender over him before Leech ended the call.

At 8:00 a.m. on November 21, 2008, Mayer met with his supervisor, defendant David Lomax. Although Mayer did not recall exactly what was said at that meeting, he conceded that Lomax could have ordered him to have no further contact with Griffeth and no further involvement in Griffeth's case. In any event, however, on November 24, 2008, Mayer arranged a meeting with Judge DeWeese and explained to the judge that, in light of the events of November 20, Mayer now believed that he had a conflict of interest in the case and that supervision of Griffeth's release should be transferred from the OAPA to the Richland County Probation Department. Judge DeWeese agreed, and in ordering the transfer, also included additional "Special Conditions of Supervision" with which Griffeth agreed to comply. Included in those special conditions was Griffeth's agreement to "avoid association" with Jennifer Leech and Demi Leech.

Even though Mayer was eventually removed from his position with the OAPA, and even though that removal decision was affirmed both by an administrative body and by the Court of

Common Pleas for Franklin County, Ohio, Griffeth's troubles stemming from the events of November 20, 2008, were not yet over. On March 22, 2010, Griffeth's new supervising officer, Jason Hoover, filed with Judge DeWeese four allegations of violations of Griffeth's conditions of supervision. After an evidentiary hearing, Judge DeWeese found that the testimony adduced at the hearing was sufficient to support three of those allegations. Specifically, the judge concluded that Griffeth violated the prohibition on associating with Jennifer Leech both by allowing Leech to live in his house (even though Griffeth claimed that he himself had moved to a home a few doors away) and by allowing Leech free use of a car from a dealership that Griffeth managed. Judge DeWeese further concluded that Griffeth had not been "truthful, respectful and cooperative with all law enforcement officers, supervision officers and court personnel" when he falsely denied that he had traveled to Florida with Jennifer Leech.

Having found that Griffeth violated conditions of his supervision, Judge DeWeese sentenced Griffeth to six months at the Community Alternative Center. The order further provided that "Jennifer Leech is to be removed from the home owned by the defendant and vehicle associated with his business."

Less than two months later, Griffeth and Leech filed this action in federal district court, naming Mayer and 26 other individuals and government agencies as defendants. The plaintiffs' complaint, coupled with a later-filed amended complaint, contained 284 numbered paragraphs that made allegations of conspiracy; violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO); malicious prosecution; municipal liability; due process violations; equal protection violations; and, pursuant to 42 U.S.C. § 1983, violations of the plaintiffs' First, Second, Fourth, and Fourteenth Amendment rights. Through a series of district-court orders and voluntary dismissals, the plaintiffs' claims against all defendants were

ultimately dismissed, and the action was terminated on October 11, 2012. Plaintiffs Griffeth and

Leech then filed a notice of appeal seeking to overturn the district court's dismissal of claims

against five OAPA defendants and the district court's grant of summary judgment to defendant

Mayer based on qualified immunity grounds.

## DISCUSSION

### *Claims Against Defendant Mayer*

In five separate issues, plaintiffs Griffeth and Leech contend that the district court erred

in granting summary judgment to defendant Mayer on qualified immunity grounds on the

plaintiffs' claims that Mayer violated their First, Second, Fourth, and Fourteenth Amendment

rights. We review *de novo* the grant of summary judgment by a district court. *See Dodd v.*

*Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). Summary judgment will be granted "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed R. Civ. P. 56(a). A genuine dispute of material fact exists

only when, assuming the truth of the non-moving party's evidence and construing all inferences

from that evidence in the light most favorable to the non-moving party, there is sufficient

evidence for a trier of fact to find for that party. A non-moving party cannot withstand summary

judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *See Ciminillo*

*v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The doctrine of qualified immunity developed in order to provide protection from civil

liability under 42 U.S.C. § 1983 for government officials in the performance of discretionary

duties. However, such protection is available only if the officials' "conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Consequently, in order to determine whether any defendant is shielded by qualified immunity, "we apply the two-prong *Saucier* test and inquire (1) whether the officer violated a constitutional right and (2) if so, whether that constitutional right was clearly established such that a 'reasonable official would understand that what he is doing violates that right.'" *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 443-44 (6th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (internal quotation marks omitted), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "A court of appeals may exercise its discretion to decide which prong of the test to address first in light of the circumstances of the case." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson*).

### 1. Interference with Plaintiffs' Freedom of Association

When choosing to address first the question whether an official violated a constitutional right, a court "must identify 'the specific constitutional right allegedly infringed.'" *Simmonds*, 682 F.3d at 444 (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Initially, Griffeth and Leech argue that Mayer violated their First Amendment right to freedom of association by "author[ing], insert[ing], and/or implement[ing]" the restriction in Griffeth's "Special Conditions of Supervision" that Griffeth "avoid association with" Leech. More specifically, the plaintiffs contend that, despite being ordered not to have further involvement in Griffeth's supervision after the incident on November 20, 2008, during which a drunken Mayer caused Griffeth to be held on charges that he violated the terms of his court-supervised release, Mayer, in fact, convinced Judge DeWeese to forbid contact between the plaintiffs. Assuming, for the sake of argument, that Mayer *requested* inclusion of the term prohibiting contact between Griffeth and Leech, it was Judge DeWeese who actually *ordered* the associational separation. *See Leech v. DeWeese*,

11

689 F.3d 538, 541 (6th Cir. 2012) ("At this time, *Judge DeWeese* placed an additional condition on Griffeth prohibiting Griffeth from having any contact with Leech or with Leech's minor daughter." (Emphasis added.)).   Mayer thus cannot be held responsible for actions undertaken by the judge with "jurisdiction over matters related to Griffeth's early release from jail and his community control sanctions, including the condition prohibiting Griffeth's contact with Leech." *Id.* at 543.  *Mayer* therefore did not infringe upon the plaintiffs' rights to freedom of association, and the district court did not err in granting Mayer summary judgment on this claim.

### 2.  Unreasonable "Seizure" of Telephone Calls Between the Plaintiffs

Relying upon the provisions of 42 U.S.C. § 1983, the plaintiffs next assert that their Fourth Amendment right to be free from unreasonable government searches and seizures was infringed when Mayer jealously and illegally intercepted telephone calls between Leech and male callers, including Griffeth.  We have explained that "[t]o state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).

However, our examination of those § 1983 components is tempered by the summary-judgment standard of proof we are required to employ in this matter.  As the United States Supreme Court has noted, before a district court can deny a defendant's motion for summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a

preponderance of the evidence that the plaintiff is entitled to a verdict . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Adhering to that standard, the district court properly concluded that Mayer was entitled to summary judgment on the plaintiffs' claim of illegal interception of telephone conversations. In their complaint, the plaintiffs alleged:

> During the period of May 1, 2008[,] through November 30, 2008[,] and through the present date, the Defendant John Mayer, while acting under color of law at all times relevant to this Complaint, individually and/or in concert/conspiracy with each other, violated the civil rights of Edwin Griffeth and/or Jennifer Leech by intercepting the private conversations of the Plaintiffs by means of the use of an electronic device. Defendant John Mayer never secured a search warrant and/or proceeded to intercept these private phone conversations without probable cause, and in violation of the laws of the State of Ohio and/or the United States of America.

Yet, the plaintiffs failed to offer any relevant evidence to buttress those assertions. In fact, the strongest evidence proffered by the plaintiffs in support of this allegation is the following statement contained in an affidavit by Jennifer Leech prepared during the litigation:

> I explained that Defendant John Mayer was intercepting my calls between me and any male person that called me, or I called, on my cell phone. I explained that Defendant John Mayer was a law enforcement officer and that Defendant John Mayer admitted to me that he had access to a Nextel device that would enable him to intercept my phone calls whenever he chose to. Defendant John Mayer admitted to me that he was intercepting my phone calls whenever he chose to. Defendant John Mayer admitted to me that he was intercepting my phone calls without permission from me or any other person, including those male persons that I spoke with over my phone. Exhibit "19-A" through and including "19-J" fairly and accurately depict the type of devices that could be used for this purpose. Defendant John Mayer then proved to me that he had intercepted my phone calls by repeating, verbatim, the conversations that I had with the male persons I spoke to.

13

That bald assertion of eavesdropping, however, is insufficient to support a verdict for the plaintiffs on this claim. In fact, when testifying about the alleged interceptions in an administrative hearing regarding Mayer's removal from his OAPA position, Leech claimed only that:

> In January of '08 [Mayer] stated to me after going to a birthday party that he knew where I went and he was proud of my behavior there, and he knew where I went, which I hadn't told him – it was a birthday party – and that he could listen to my phone calls within five miles. And I was, of course, like what?

> And he said[, "]Yes, our Nextels are able to do this; we're not supposed to use them like that, but we can.["]

Of course, this testimony by Leech in no way supports her claim that Mayer actually *was* listening to her phone calls. The fact that Mayer was aware of Leech's attendance at a birthday party—and her demeanor at the gathering—is indicative of visual, not audio, surveillance of the plaintiff. Furthermore, Mayer's supposed statement that he *could* listen in on phone conversations and that his phone *could* access other individuals' calls does not constitute admissible evidence that he actually *did* so. Damningly, when Leech later was asked whether she actually believed that Mayer "could listen to [her] telephone calls on his work phone," she answered only, "I don't know," and "I didn't know whether to believe it or not, to be honest."

Nor do the exhibits referenced in Leech's affidavit lend any credence to her claim. It is true that Exhibits 19A-J depict devices that can be used to intercept telephone conversations. The "cellular intercept" systems pictured and described in the exhibits, however, are designed to "be custom built to fit inside of a surveillance van," not an individual cell phone. Those systems

14

thus have no relevance to Leech's assertions that Mayer claimed to have used a department-issued *phone* as an all-purpose interception device.

It is true that two pages of the referenced exhibits describe how a cell phone may be turned into "a spy gadget." In order to utilize such "technology," however, the person intercepting a phone call to another individual must clone the phone of the person whose calls are to be intercepted. According to the article contained on pages I and J of Exhibit 19, "[t]o clone a phone, you have to make a copy of its SIM card, which stores the phone's identifying information." Here, the plaintiffs adduced absolutely no evidence that would support a conclusion that Mayer somehow stole the SIM [subscriber identity module] card from Leech's cell phone and transferred the information from it to his own phone.

In short, the plaintiffs have failed to point to any evidence that would lead a reasonable jury to find for Leech and Griffeth on their claim that Mayer illegally intercepted cell-phone conversations between the two plaintiffs. Because Leech and Griffeth were unable to satisfy their burden, the district court did not err in granting Mayer summary judgment on this claim as well. The plaintiffs' introduction of a "mere scintilla" of evidence in their favor is insufficient to withstand Mayer's summary-judgment motion.

### 3. *Restriction on Plaintiff Leech's Right to Bear Arms*

In a truly bizarre argument, Leech next submits that her constitutional right to bear arms was infringed when Mayer, "without a hearing and due process of law," enlisted the assistance of the county prosecutor's office to retrieve from Leech a service weapon that he allegedly gave her for her protection. Not only does Leech have no legitimate claim to a state-issued firearm that was improperly loaned to her, but the retrieval of that weapon by government authorities in no

way restricts the plaintiff's own individual right to possess another firearm. This issue is patently without merit, and the district judge properly granted Mayer summary judgment on this claim.

### 4. Alleged Conspiracy to Accuse Plaintiff Griffeth Falsely

In their next appellate issue, the plaintiffs contend that the district court erred in granting summary judgment to Mayer on their claim that Mayer and other officials conspired to have Griffeth taken into custody on November 20, 2008, based upon false accusations that Griffeth had violated the conditions of his judicial release. This allegation of error must fail as a result of two insurmountable failures of proof on the part of the plaintiffs.

First, despite the fact that Mayer's actions on November 20, 2008, were driven by a combination of drunkenness, jealousy, and vindictiveness, the appellate record clearly establishes that, at the time Mayer detained Griffeth, Mayer had observed Griffeth in violation of at least two conditions of his release. The "Sex Offender Special Conditions" of release to which Griffeth agreed on November 6, 2006, explicitly provided that Griffeth could not "form a relationship with a man or woman who has physical custody of children without the knowledge and permission of [his] supervising officer," and could not "drive or ride in a motor vehicle with females without the knowledge and permission of [his] supervising officer." Because Mayer personally observed Griffeth driving with Leech, a female who had physical custody of a minor child, the defendant did not accuse Griffeth falsely of violating the conditions of release.

Second, the plaintiffs' basis for this claim on appeal is that Mayer conspired with other individuals to have Griffeth accused falsely of a release violation on November 20, 2008. In their own complaint in this matter, however, the plaintiffs allege, "During any and all relevant times, Defendant #1, John Mayer[,] never disclosed to the OAPA that he had a conflict of

interest in Plaintiff #2, Edwin Griffeth's[,] case." If Mayer's co-defendants were unaware on November 20, 2008, that Mayer's dogged pursuit of Griffeth was driven by unethical, unprofessional motives, no conspiracy to mismanage Griffeth's judicial release can be proven. The district court thus also properly granted summary judgment to Mayer on this allegation.

### 5. *Allegedly Illegal Seizure of Griffeth's Cell Phone*

In their final assignment of error regarding the district court's grant of summary judgment to defendant Mayer, the plaintiffs submit that Mayer unconstitutionally seized Griffeth's cell phone on the night of November 20, 2008, and then converted the phone to his own use in order to call plaintiff Leech from that device. The seizure of the cell phone found in Griffeth's possession was not improper. One of the conditions of release to which Griffeth himself agreed on November 6, 2006, was that he would not possess, own, use, or have under his control a cellular phone. Nevertheless, Griffeth admitted that he was indeed in possession of a cell phone in violation of that release condition. Moreover, the OAPA's standard conditions of supervision, to which Griffeth also agreed on November 6, 2006, provided that "a supervising officer or other authorized representative of the Department of Rehabilitation and Correction" may "search, without warrant, . . . [Griffeth's] person, [his] motor vehicle, or [his[ place of residence . . . at any time." *See also* Ohio Rev. Code Ann. § 2967.131(C) (authorizing warrantless searches of a supervised individual's person, residence, motor vehicle, real property, or item of tangible or intangible personal property if the field officer possesses reasonable ground to believe the person is not complying with a term or condition of authorized release); *United States v. Loney*, 331 F.3d 516, 521 (6th Cir. 2003) (holding that Ohio Rev. Code Ann. § 2967.131(C) "passes constitutional muster"). Mayer, as an employee of the OAPA, which was then charged with

17

supervising Griffeth's release, thus was authorized to remove the prohibited item from Griffeth's possession.

The plaintiffs also insist that Mayer's use of the confiscated cell phone to call Leech amounted to an improper, warrantless search. Mayer's ruse to trick Leech into accepting his call by making her think the call was from Griffeth was improper and unprofessional. However, such limited use of the phone did not amount to an unreasonable, unconstitutional search because the plaintiffs offered no indication that Mayer accessed any private information on the phone in order to call his ex-wife.

### Claims Against Defendant Officers of the OAPA

Defendant OAPA officers Sampson, Nelson, Daubenspeck, Lomax, and Todd filed with the district court a motion to dismiss the plaintiffs' claims against them both for lack of subject-matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), and for failure to state a claim upon which relief could be granted, *see* Fed. R. Civ. P. 12(b)(6). The district court granted the motion, holding that the OAPA defendants were protected by Eleventh Amendment immunity to the extent that Griffeth and Leech sued those defendants in their *official* capacities for money damages. *See* U.S. Const. amend. XI. On appeal, the plaintiffs do not challenge that determination but instead argue that the district court erred in dismissing all claims against those defendants in their *individual* capacities.

We review *de novo* a district court's grant of a motion to dismiss. *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008). In doing so, we "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430

(6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). However, in order to survive a motion to dismiss, the plaintiffs still must allege sufficient facts to "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Griffeth and Leech allege that defendants Sampson, Nelson, Lomax, and Todd negligently supervised Mayer and thus allowed him to continue his obsessive, jealously-driven efforts to find Griffeth in violation of the terms and conditions of his judicial release. But, as the United States Supreme Court has recognized, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. Rather, "a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). This the plaintiffs cannot do.

As discussed previously, the plaintiffs' own complaint concedes that Mayer never disclosed to the OAPA that he had a conflict of interest in this matter because of his prior and ongoing predatory relationship with Leech, an acquaintance of Griffeth.[1] Without knowledge that Mayer had improper, ulterior motives in ensuring Griffeth's compliance with the terms of his release, defendants Sampson, Nelson, Lomax, and Todd cannot be held accountable for any supervisory lapses. Moreover, the claims of constitutional violations against these defendants

---

[1]Once that conflict of interest came to light after the events of November 20, 2008, disciplinary action was taken against Mayer, ultimately resulting in defendant Mayer's termination from his position with the OAPA.

are simply conclusory allegations without any factual support in the record. The district court thus correctly dismissed all causes of action against these OAPA defendants.

Dismissal of the claims brought against defendant Daubenspeck in his individual capacity also was proper. The plaintiffs assert that Daubenspeck was responsible for the allegedly unconstitutional special condition of probation that prohibited Griffeth's association with Leech or her daughter. The document containing that special condition, however, explicitly states that the special conditions are imposed by the Richland County Court of Common Pleas or the Richland County Adult Court Services, to whom Griffeth's supervision had been transferred by the OAPA. Consequently, Daubenspeck, an OAPA employee, cannot be held responsible for the imposition of those court/county-ordered conditions of release.

## **CONCLUSION**

John Mayer's actions detailed in the course of this litigation were obviously unprofessional, personally disgraceful, and wholly unethical. What is at issue in this appeal, however, is whether Mayer's harassing, stalking behavior, and the supervision provided him by the OAPA defendants, were conspiratorial in nature and in violation of settled constitutional principles. For the reasons discussed, we conclude that the plaintiffs failed to meet their evidentiary burden of demonstrating a genuine dispute of material fact regarding the claims made against Mayer. The plaintiffs also failed to allege sufficient facts to make plausible claims of constitutional violations against Mayer's OAPA supervisors and cohorts. We thus AFFIRM the judgments of the district court granting the OAPA defendants' motion to dismiss and Mayer's motion for summary judgment.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.** I disagree with the majority's conclusion that Leech presented insufficient evidence that Mayer intercepted and seized her cell-phone calls to survive summary judgment.

The majority regards Leech's assertion that Mayer intercepted her phone calls as a "bald assertion of eavesdropping" and dismisses Exhibits 19A-J on the bases that the systems have no relevance to Leech's assertions that Mayer claimed to have used a department-issued phone as an all-purpose interception device, and that there is no evidence Mayer somehow stole the SIM card from Leech's phone and transferred the information from it to his own phone. But Leech is not required to prove the exact mechanism by which Mayer intercepted her calls, only that he did.

Leech presented more than bald assertions. First, according to Leech, Mayer himself told Leech that he had intercepted her calls.[1] I fail to see how an allegation supported by a party's admission constitutes a bald assertion. The majority inexplicably asserts that Leech's accounts

---

[1]For example, Leech's affidavit, quoted by the majority states:

I explained that  . . . Defendant John Mayer admitted to me that he was intercepting my phone calls without permission from me or any other person, including those male persons that I spoke with over my phone. . . . Defendant John Mayer then proved to me that he had intercepted my phone calls by repeating, verbatim, the conversations that I had with the male persons I spoke to.

Leech also submitted a letter she had sent to her cell-phone service provider describing Mayer's activities and admissions:

This person is a law enforcement officer, formerly being my husband. He has told me in the past that his state issued Nextel that works as a radio broadcasting each channel (sheriff, police, state highway patrol, etc.), cell phone, and as a two way radio, can be used to listen to other people's conversations (which he has proved to me by repeating conversations.) . . . . When I am engaged in conversation with any males I usually get an incoming call from a "private" [phone] and the caller just disconnects.

21

of Mayer's admissions do not support her claim that Mayer actually listened to her calls. If this were a criminal case and the prosecution's only evidence were Leech's testimony that Mayer knew facts that would have been gleaned from her conversations and in fact admitted to intercepting her phone calls, there would be no question of the sufficiency of the prosecution's proofs. Why the testimony is insufficient in this civil case with a lesser standard of proof is a mystery.

Second, the photos in the exhibits are labelled as for illustrative purposes only; the actual systems may vary. The exhibits include photos showing that this type of equipment fits in briefcase-size carriers. These smaller systems, and systems with advances since the ads were made around 2005, could very well have relevance to Leech's assertions.

Third, the allegation that Mayer used police equipment to intercept Leech's calls is not implausible. On cross-examination at Mayer's hearing before the Ohio Personnel Board of Review, Leech noted that there was a case involving use of police equipment to eavesdrop in Mansfield,[2] and testified that Mayer told her that he could listen to her telephone calls on his work phone.

In short, there was adequate evidence to withstand summary judgment on the claim of unreasonable seizure of cell-phone calls, and I would reverse the grant of summary judgment and remand that claim. In all other respects, I join in the majority's affirmance.

---

[2]*McKinley v. City of Mansfield*, 404 F.3d 418, 423 (6th Cir. 2005), provides stark indication of systematic cell-phone spying in Mansfield, Ohio. The investigation there, known as "scannergate," involved an officer's misuse of scanners to eavesdrop on citizens' cell-phone conversations. Ultimately, the investigation involved interviews of more than thirty police officers.