HELENE N. WHITE, Circuit Judge,
concurring in part and dissenting in part.
CONCURRING IN PART AND DISSENTING IN PART
I agree that summary judgment was properly granted in favor of Richland County Sheriff J. Steven Sheldon, Maj. Op. at 625, and that Plaintiffs’ fabrication- *633 of-evidence claims against the remaining individual Defendants were properly dismissed, Maj. Op. at 628-30. I also agree that France’s Brady claim was properly dismissed because, given DEA Special Agent Lucas’s identification of France at her trial and that the jury heard that Bray became an informant after being imprisoned for a felony conviction (manslaughter),[1] there is no reasonable probability that the outcome of France’s trial would have differed had the challenged evidence been disclosed to the defense, Maj. Op. at 630-31. And, I too conclude that the district court did not abuse its discretion by denying additional discovery given Plaintiffs’ counsel’s strategic decision, unexplained on this record, not to depose Defendants Metcalf, Mayer, and Sheldon, Maj. Op. at 631-32, and further, that the district court did not abuse its discretion by denying Plaintiffs’ belated motion to supplement the summary judgment record with an expert opinion. See Maj. Op. at 632.
However, I disagree with the majority regarding Ballard’s malicious prosecution claims against Richland County Detective Charles Metcalf, Sergeant Matthew Mayer, and Captain Larry Faith, and France’s malicious prosecution claims against Met-calf and Faith. With or without Bray’s 2012 declaration,[2] Plaintiffs presented evidence sufficient to survive summary judgment. I would also reverse the grant of summary judgment to Richland County on Plaintiffs’ related Monell claims.
I.
Operation Turnaround began in late 2004. The RCSO signed Jerrell Bray as a confidential informant (CD in January 2005. Beyond that point, I part with the majority’s depiction of the facts in certain respects. Viewing the facts in the light most favorable to Plaintiffs, as we must, Plaintiffs presented evidence that the RCSO, not the DEA, determined who would be targeted in Operation Turnaround. App’x 09-cr-222 Metcalf Testimony at 1700-01; Faith Testimony at 2218-19; Lucas Testimony 2293-94. It is undisputed that Bray was working as a Cl for the RCSO to avoid prosecution for an incident involving stolen property in Richland *634 County discovered by Detective Metcalf. And it was RCSO officers, including Met-calf, Mayer, and Faith, who knew by sight Operation Turnaround targets including Lowestco Ballard and Ronald Davis, the person who purportedly sent Geneva France to deliver crack to Bray. PID 1810-11/Metcalf testimony at France trial. The majority presents one view of the evidence, that is, that the DEA took control of Operation Turnaround and that DEA Agent Lucas’s testimony and identifications of France and Ballard foreclose their malicious prosecution claims. But Lucas testified that he did not know the Mansfield area or any of the targets the RCSO had selected; he came in from Cleveland to assist in the RCSO investigation.
Unmentioned in Defendants’ appellate briefs and the majority opinion is that as early as February 10, 2005, months before DEA Special Agent Lee Lucas joined Operation Turnaround in August 2005, Detective Metcalf and his supervisor, Sergeant Mayer, were allowing Cl Bray to turn recording equipment on and off during alleged drug buys and did not know where Bray was during an alleged drug transaction; and Captain Faith was aware of these improprieties. See Plaintiffs’ Sealed Appendix at 41/Brown Rpt. Detective Brown’s notes, which were before the district court in the instant case, PID 7648/ Pis. Response to Metcalfs Mo. for Summ. J. filed 10/4/12, were discussed in Mott v. Mayer, 524 Fed.Appx. 179 (6th Cir. 2013), another “Operation Turnaround” case:
We describe a few of the events referenced by the district court in order to illustrate the conduct of Bray and the investigators during “Operation Turnaround.”
On February 10, 2005, Metcalf asked Detective Dawn Brown, a detective with METRICH [3], a multi-county drug task force, to assist with a controlled buy that Bray was to make that day. Brown expressed concern that Bray, who was on parole after serving a prison sentence for involuntary manslaughter, was acting as a confidential operative without the consent of his parole officer. Bray nevertheless completed the buy. Brown’s notes express several concerns about the way that the buy was conducted. Mayer and Metcalf did not know where Bray was during the transaction, and they did not follow Bray after the buy, even though they were responsible for monitoring him in order to ensure both the safety of the parties involved and the integrity of the evidence.[4]
Mott, 524 Fed.Appx. at 180.
Ballard and France were indicted on *635 November 9, 2005,[5] the latter for a drug deal alleged to have occurred on October 25, 2005. France was convicted on false evidence, sentenced to ten years’ imprisonment, and spent sixteen months in prison. Ballard spent ten months in pretrial detention and was acquitted.
II.
Bray pleads guilty, admitting to framing France, Nabors, Ward and Parker
France, Ballard, Dwayne Nabors, Joe Ward II, and Johnnie Parker instituted this action in December 2007, asserting claims of malicious prosecution and fabrication of evidence against RCSO officers Metcalf, Mayer, Faith, and Sheldon; RCSO’s paid Cl, Jerrell Bray; DEA Special Agent Lee Lucas;[6] the United States *636 and various DEA employees, various other individuals, and Monell liability against Richland County. Shortly after, Cl Bray, who claimed to have made controlled buys from fifteen individuals between September 6 and October 25, 2005, pleaded guilty to two counts of perjury and five counts of deprivation of civil rights, admitting to framing France and Nabors by using stand-ins at staged transactions, and to framing Ward and Parker by claiming that he had purchased drugs from them that were already in his possession.[7]
The Assistant United States Attorney stated at Bray’s December 20, 2007 plea hearing:
The five separate counts of deprivation of civil rights-in order to violate that statute, it would have to be established beyond a reasonable doubt that Mr. Bray, while acting under color of state law, willfully deprived [the individuals of their] rights to be free from unreasonable seizure and the Fifth Amendment right to not be deprived of liberty without due process of law.
[As to Geneva France:] Count 5 alleges that on October 25, 2005, again, there was an individual targeted as being a trafficker of cocaine. A deal was set up with purportedly a female who was to deliver the two and-a-half ounces of crack cocaine to Mr. Bray and to a law enforcement officer on behalf of this targeted drug dealer.
Again, a confederate [of Bray] was enlisted to show up. Neither the targeted drug dealer [sic] had actually been involved in the case, and the confederate had posed as that person, and the woman [confederate] did show up bringing Mr. Bray’s crack cocaine, which was turned over to Mr. Bray and law enforcement.
Mr.. Bray knowingly, not immediately, but shortly thereafter came up with an identification, a person that has been identified in the information as G[eneva] F[rance]. GF was falsely identified as being the person that brought the crack cocaine on that day.
That individual GF was indicted, arrested, tried, convicted and sentenced to ten years .... So those are the five civil rights cases [in four of them] he basically .... provided false identification of persons being drug traffickers...
As far as the two perjury counts ... each alleges that in two separate trials here in Federal District Court in Cleveland, Count 6 alleges that on February 14th, 2006, Mr. Bray was testifying in the trial of G[eneva] F[rance] ... and it is alleged that Mr. Bray testified that GF was the person in the car delivering ■ the crack cocaine ... [Bray] identified the Defendant in Court as being that person when he knew that GF had not been present at the drug deal ....
PID 1016-19 (emphasis added).
As we recounted in another Operation Turnaround case, Webb v. United States, 789 F.3d 647, 652-53 (6th Cir. 2015):
Following the completion of Operation Turnaround, Bray ... disclosed that Lucas conspired with him to frame innocent individuals ...
This admission prompted the Office of Inspector General (OIG) of the United States Department of Justice to launch an investigation, which revealed that numerous Operation Turnaround targets ... did not participate in the drug deals for which they were charged. Bray had used stand-ins to participate in the drug deals and then falsely identified each stand-in as an Operation Turnaround target. Robertson, 753 F.3d at 612. Bray later testified that Lucas did not con *637 spire with him to frame targets and that he acted on his own initiative. In any event, the OIG concluded that law-enforcement officials supported Bray’s false identifications by knowingly making false reports and testimony and by covering up his misdeeds.
The United States charged Lucas with making false statements, violation of civil rights, obstruction of justice, and perjury. The jury found Lucas not guilty. Despite the verdict, a 2011 OIG investigation concluded that Lucas falsified reports and testimony to corroborate Bray’s false identifications.
Webb, 789 F.3d at 652-53 (emphasis added).
III.
Plaintiffs filed their amended complaint on April 18, 2008.[8] PID 6101. In late May and June 2008, DEA Agent Lucas and RCSO Officers Metcalf, Mayer, Faith, and Sheldon separately moved for summary judgment on qualified immunity grounds. R. 50-53, 57. Plaintiffs responded with an omnibus memorandum opposing Defendants’ motions. PID 1599/filed 10/15/08. RCSO Detective Metcalf Pleads Guilty of Falsely Identifying Nabors at Trial as a Participant in a Drug Deal
Cl Bray was not the only Defendant to plead guilty while this matter was before the district court. In May 2009, RCSO Detective Metcalf, Cl Bray’s supervisor throughout Operation Turnaround,[9] notified the district court that a criminal bill of information had been filed against him; that he had pleaded guilty on May 14, 2009 to one count of violation of civil rights, 18 U.S.C. § 242, i.e., presenting false evidence against Nabors at trial regarding a controlled purchase on September 20, 2005, and falsely identifying Nabors as a participant in a drug deal; and that his sentencing was scheduled for November 5, 2009.
The Information to which Metcalf pleaded guilty states in pertinent part:
3. On September 20, 2005 ... MET-CALF assisted DEA in conducting a controlled purchase of cocaine and cocaine base from a group of individuals, purportedly including Dwayne Nabors. [METCALF’s] principal function was to provide physical surveillance and backup security for a series of meetings relating to the purchase of the controlled substances.
4. One of the aforementioned meetings was conducted in the parking area of a business establishment owned and operated by Dwayne Nabors.
5. On November 10, 2005, Dwayne Na-bors was charged in a federal indictment with conspiring to distribute and distributing cocaine and cocaine base ... stemming from the controlled purchase on September 20, 2005. Dwayne Nabors was subsequently arrested and detained pending trial for these charges and one additional charge.
6. The trial ... was held ... between July 10 and July 24, 2006. The jury acquitted Dwayne Nabors on the charge of conspiracy to distribute and hung on the charge of distribution. [METCALF] appeared as a witness for the prosecution at the trial.
7. Dwayne Nabors was not present at the meeting referenced in Paragraph 4, above, nor did he participate in any manner in the drug transaction which occurred on September 20, 2005.
*638 On July 14, 2006, ... METCALF, while acting under the color of law, did willfully deprive Dwayne Nabors of the right to due process of law and to not have false evidence knowingly presented against him, as is guaranteed by the Fifth Amendment to the Constitution and the Laws of the United States, in that, while testifying as a detective for the Richland County Sheriffs Office and on behalf of the United States of America, ... METCALF [ ] declared that the meeting referenced in Paragraph 4, above, had not been videotaped, and that after said meeting he and LML [DEA Special Agent Lucas], another law enforcement officer, positioned themselves in such a manner as to allow for both officers to positively identify Dwayne Nabors as being a participant; whereas ... METCALF [ ] well knew and believed that said meeting had been videotaped, and that he and LML had not positioned themselves so as to allow for an identification of Dwayne Nabors.
PID 4170-72.
After Metcalf pleaded guilty, he withdrew the affidavit 'he had submitted in support of his first motion for summary judgment,[10] which stated in pertinent part:
9. On September 9, 2005, a controlled buy of illegal drugs was made from Lowestco Ballard. At the time of the controlled buy, I was at the Richland County Sheriffs Office operating surveillance equipment. I did not identify Lowestco Ballard as the individual involved in the controlled buy on September 9, 2005.
11. On September 20, 2005, a controlled buy of illegal drugs was made from Dwayne Nabors. My involvement consisted of providing security and surveillance. I did not identify Dwayne Nabors as being involved in the controlled buy on September 2005.
12. My involvement in the October 25, 2005, controlled buy from Geneva France primarily consisted of operating the surveillance equipment and providing security support. I did not identify Geneva France as being involved in the controlled buy. Jerrell Bray and DEA agent Lee Lucas independently identified Geneva France as being involved in the October 25, 2005, controlled buy.
PID 313-14/Metcalf Affid. attached as exhibit to Metcalfs Mo. for Summ. J. filed 6/30/08.
January 2011 - The United States and all Federal Defendants Settle with Plaintiffs
In January 2011, the United States and all federal defendants were dismissed pursuant to a comprehensive settlement with all Plaintiffs. PID 6130.
On January 4, 2012, the district court granted summary judgment in full to Mayer, Faith, and Sheldon and in part to Met-calf, denying Metcalf summary judgment as to Ballard’s and Nabors’s false arrest, malicious prosecution, and fabrication of evidence claims. PID 5680, 5721.
On March 27, 2012, Metcalf moved for summary judgment on Ballard’s false arrest claim, PID 5858, and Richland County moved for summary judgment on Plaintiffs’ Monell claims.[11] Bray died in prison in September 2012.
*639 In October 2012, the district court granted Metcalf summary judgment on the merits on Ballard’s claims, relying in part on Metcalfs statement in his second affidavit, dated March 22, 2012, PID 5862, that he did not view the video of the purported Bray-Ballard transaction on September 9, 2005, prior to Ballard’s trial, PID 7823, and granted Richland County summary judgment on Plaintiffs’ Monell claims, concluding that “Defendants have met their burden to show that no issue of fact remains for a jury to decide concerning Plaintiffs’ Monell claims and the claims of Plaintiff Ballard.” PID 7809. Following this ruling, other than Ballard’s and France’s claims against Bray[12], only Na-bors’ § 1983 claims against Metcalf remained. PID 7812. Nabors settled those claims and a stipulated dismissal entered on April 17, 2015. PID 7939.
The district court dismissed the case on April 21, 2015. PID 7940.
IV.
The majority affirms the district court’s determination that, without Bray’s 2012 affidavit, there was no record evidence that Metcalf committed any Fourth Amendment violation against Ballard. PID 7822. I disagree. I also disagree that the district court properly granted summary judgment in Mayer and Faith’s favor on Ballard’s Fourth Amendment claims.
A. Ballard’s Malicious Prosecution Claims
Malicious prosecution “encompasses • wrongful investigation, prosecution, conviction, and incarceration.” Sykes v. Anderson, 625 F.3d 294, 308 (6th Cir. 2010) (quoting Barnes v. Wright, 449 F.3d 709, 715-16 (6th Cir. 2006)). Plaintiffs presented evidence from which a fact finder could conclude that Mayer, Metcalf, and Faith influenced the decision to prosecute Ballard and that the prosecution lacked probable cause. See Sykes, 625 F.3d at 308.
METRICH Project Director Dino Sgambellone testified that as a result of Detective Dawn Brown’s report and various other reports of improprieties, MET-RICH deemed Bray unreliable as a Cl and “deactivated” him; Richland County, however, continued using Bray. DEA Agent Lucas testified that even after the DEA became involved in Operation Turnaround, RCSO Detective Metcalf and Sergeant Mayer continued to control Bray most of the time. App’x 09-er-222 Lucas testimony at 2293-94, Metcalf testimony at 1709. Agent Lucas also testified that Metcalf, Mayer, and Faith, all of whom were directly involved in monitoring drug transactions involving Cl Bray, provided information that went into Lucas’s reports of each transaction, France App’x 2291-96, reports that went to Assistant United States Attorney Bias Serrano, who prosecuted Plaintiffs. AUSA Serrano testified on deposition that he received reports to support the indictment of each of the Operation Turnaround targets and recalled that some were RCSO reports. Id. at 3184-85.
Metcalf testified that before setting up any drug buys, RCSO officers would view photographs of the targets and suspects so they would know what they looked like. France App’x at 1780-1782. Metcalfs, Mayer’s, and Lucas’s names appear in the official report of the September 9, 2005, transaction in which Transou was a stand-in for Ballard. Metcalf monitored and kept sound recordings of the calls setting up the purported Bray-Ballard buy -and of the transaction, Mayer videotaped the transaction, and Faith monitored the cobble phone from the office. Phone records show that *640 the phone numbers dialed, whether by Bray or Metcalf, were not Ballard’s, but the official report of the September 9 transaction says nothing to that effect or that the man who purportedly was Ballard referred to himself in the third person. The audio tapes of the transaction, as the majority notes, reveal that the person who was supposedly Ballard did not know how to find a location that was within 11/2 miles of Ballard’s house (Ballard was a lifelong resident of Mansfield), but the official report says nothing to that effect. Also omitted from the official report is that Bray is 5’7”, Ballard is 6’5” and thin, and the stand-in for Ballard, Transou, appears ■in the video to be around four inches taller than Bray.
A reasonable factfinder could conclude that the actions or omissions of Metcalf, Mayer, and Faith constituted either influence over or participation in the decision to prosecute Ballard even though they did not make the ultimate decision to prosecute him. See Sykes, 625 F.3d at 311 (concluding that “a reasonable jury could have found the Defendants liable for malicious prosecution ... [where] there was not only a lack of probable cause to institute a criminal proceeding against the Plaintiffs, but the Defendants’ actions ... were sufficient to qualify as either ‘influence [over] or participation] in the decision to prosecute’ regardless of the fact that the Defendants, themselves, did not make the ultimate decision’ .... Based on the evidence ... a reasonable jury could have concluded that Sgt. Nichols testified falsely at the preliminary hearing and that her statements were material to the state court’s finding of probable cause.”)[13]. As in Sykes, it is for the factfinder to determine whether a reasonable officer would believe that Ballard had violated the law. See Maj. Op. at 625-26. I would reverse the grant of summary judgment to these Defendants on Ballard’s malicious prosecution claim.
B. France’s Malicious Prosecution Claims
Plaintiffs also presented sufficient evidence to survive summary judgment regarding whether RCSO Defendants Met-calf and Faith influenced, participated, or aided in the decision to prosecute France.
Lucas’s Testimony at France’s Trial
Lucas identified France at her trial in February 2006 as the woman who sold *641 drags to Bray on October 25, 2005. He testified that when she got in the car, he introduced himself as “Todd” and she introduced herself as “Little S.” PID 2134. Lucas testified that after the drug transaction, Metcalf showed him a photo but it was not of the womari, who had sold them drags on October 25, 2005. Two days after the drug buy, however, Metcalf showed him a photo of France, and Lucas identified her as the woman. PID 2135. Lucas testified that he was present when the same photo was later shown to Bray and Bray said “yeah, that’s Geneva.” PID 2136.
Metcalfs Testimony at France’s Trial
Detective Metcalf testified at France’s trial that on October 25, 2005, he was responsible for “the technical work, the recordings ... basically kept security for our informant [Bray] and Lee Lucas,” and that he helped get the controlled phone-call set-up, i.e., Bray’s purported call to Ron Davis, an alias used by Herman Price. PID 1806-07, 1810, 1840. Metcalf testified that he had done surveillance on Ron Davis before the purported Bray/Davis-France drug transaction, and that he and Captain Faith performed surveillance of the drug buy and observed Bray actually meet with Ron Davis. PID 1806, 1811. Metcalf testified that he received information from Jerrell Bray regarding the identity of the female. On cross-examination, Metcalf testified that because Bray gave him the name “Geneva,” the RCSO looked for that name in the Mansfield schools photos. PID 1849. Metcalf also testified that he came across Geneva France’s name after getting police department records of the calls made at 154 Arthur, Geneva France’s address. PID 1850. The photo the RCSO showed to Bray and Lucas is a sixth-grade photograph of France. France App’x 3196. .France was twenty-three years old when she was tried for selling drugs to Bray and Lucas.
Testimony at Lucas’s Trial in 2010
Bray testified at Lucas’s trial that he did not call Ron Davis to set up the drag transaction, instead he called Karmiya Moxley, a friend of Bray’s girlfriend Alexis Young. The second call Bray made was not to Ron Davis either. App’x 09-cr-222 Bray Testimony 1158-62,1168-69. Bray testified that Geneva France was not the woman involved in the drug transaction on October 25, 2005; Moxley, who is known as Shea Shea and “Lil S,” sold Bray crack that day. App’x 09-cr-222 Bray Testimony 1158-62, 1168; Id. Moxley Testimony at 1929. Unlike his testimony at France’s trial, Metcalf testified at Lucas’s trial that he prompted Bray to name someone as the woman involved in the transaction. France App’x/Metcalf Testimony at 1795 (“I told [Bray] we had to identify her, and he came up with a girl by the name of Geneva ... and she lived ... on Arthur, and I think my sergeant [Mayer] got a police report from Arthur and came up with the names, and one of the names was Geneva France.”) Bray said he knew Geneva from the neighborhood. Then, the RCSO obtained the sixth-grade photo of France. Id. Mayer Testimony 1618-20. Metcalf showed Bray and Lucas, separately, the photo of France, and each identified France as “Lil S” from a one-photo array. France App’x /Metcalf Testimony at France Trial 220-221, 227-28. Moxley, who actually engaged in the transaction, was a brunette, while France had dyed blonde hair. Simple observation would have alerted Metcalf that France was not present at the drug transaction.[14]
*642 Metcalf and Faith lied about following Davis/Price from his residence on Glessner Avenue to a house on Adams Street; Maj. Op. at 618-19. Davis had purportedly sent France to the drug transaction with Bray that day. A reasonable factfinder could find that Metcalf and Faith knew or should have known that Ron Davis was not aware of any drug transaction on the day Bray and Lucas met “Lil S,” a mule purportedly sent by Davis.[15] As the majority notes, the audio recording reveals that Bray and Davis/Price never discussed a drug purchase. Maj. Op. at 618-19. A reasonable factfinder could infer from Metcalfs testimony at Lucas’s trial that Metcalf pressured Bray to come up with a name for the female mule. A reasonable jury could infer from Bray’s testimony at Lucas’s trial that Metcalf and Faith knew or should have known that “Lil S” was not France but nonetheless allowed Bray and Lucas to incorrectly identify France as a mule in the transaction.
I would reverse the grant of summary judgment to Metcalf and Faith on France’s malicious prosecution claims.
V. Monell Claims
Richland County asserted in its motion for summary judgment that Plaintiffs cited no authority to support that there can be a viable Monell claim against it based on Bray’s misconduct, but Richland County’s own briefing below cited authority recognizing that the activities of paid government informants can be considered government action. See Hiser v. City of Bowling Green, 42 F.3d 382, 383 (6th Cir. 1994) (this court looks “to all the facts to determine whether a paid government informant ‘may fairly be said to be a [government] actor ... because he has acted together with or has obtained significant aid from [government] officials, or because his conduct is otherwise chargeable to the State.’ ”) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). PID 5837/Richland Cnty. Summ. J. Mo.
Without considering Bray’s 2012 declaration, Plaintiffs presented evidence that, with Bray’s input, the RCSO, not the DEA, decided whom to target in Operation Turn *643 around, and that Metcalf and Mayer largely retained control and supervision over Bray. A reasonable jury could conclude that Metcalf, Mayer, and Faith at the very least acquiesced in and, more likely, actively supported and condoned, Bray’s framing of Ballard and that Metcalf and Faith did the same with regard to France’s framing. Plaintiffs presented evidence that violations of the law by a confidential informant had to be reported to the Sheriff. Dale Fortney Testimony on Richland County’s behalf/Dep. 2884-85, RCSO SOPs 3707.
Thus, Plaintiffs presented evidence sufficient to raise an issue of fact whether Richland County had a custom of tolerance of or acquiescence in federal rights violations, which would support the existence of an illegal municipal policy or custom. See Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005) (“There are at least four avenues a plaintiff may take to prove the existence of a municipality’s illegal policy or custom. The plaintiff can look to (1) the municipality’s legislative enact--ments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.”) (citing Monell, 436 U.S. at 694, 98 S.Ct. 2018, and other cases).
I would reverse the district court’s grant of summary judgment to Richland County on Ballard’s and France’s Monell claims, to Metcalf, Mayer, and Faith on Ballard’s malicious prosecution claims, and to Met-calf and Faith on France’s malicious prosecution claim.

. At France’s trial, Metcalf testified that Bray was a convicted felon and had served a long prison sentence for manslaughter. PID 1834.

. As we observed in another "Operation Turnaround” case, Webb v. United States, 789 F.3d 647 (6th Cir. 2015):
Bray’s 2007 statements to OIG investigators that Lucas was a knowing participant in the scheme to frame Webb establishes a genuine issue of material fact as to whether Lucas lied in his grand-jury testimony. Bray told investigators that he used a DEA-provided device to record a face-to-face conversation with Webb on the day before the drug buy targeting Webb, but Webb made no incriminating statements. Bray told Lucas that he would be unable to get Webb to sell drugs at a controlled buy, but Lucas instructed him to "do what he had to do.” That night, Bray paid Conrad $200 to act as a stand-in for Webb for the following day.
In his first five interviews with federal investigators, Bray repeated his claim that Lucas was an active participant in the stand-in scheme against Webb. However, Bray later recanted these allegations at Lucas's criminal trial in 2010, where he testified that he acted alone to frame Operation Turnaround targets and lied about Lucas’s participation in the Webb drug buy.
The Defendants argue that we should not credit Bray's initial allegations because he recanted them at Lucas's criminal trial. But it is commonplace for individuals to make contradictory statements. When this occurs, we permit litigants to use inconsistencies to impeach or discredit those statements and leave it to a fact-finder to determine whether one statement is more truthful than the other .... It is for the jury to determine whether Bray was telling the truth in his first five interviews with federal investigators, Lucas’s criminal trial, or neither.
Webb, 789 F.3d at 660 (emphasis added).

. Dawn Brown was an RCSO detective. Faith Dep. at 81-82; Brown Report at 48.

. Mott further recounts Metcalf’s and Mayer’s misconduct and their acquiescence in Bray’s misconduct:
About a month later, Bray claimed that he purchased crack cocaine and a gun from Tyron Brown and Jason Westerfield in a controlled buy on March 12, 2005, and that he bought crack cocaine from Westerfield in a controlled buy on March 15, 2005. Mayer and Metcalf conducted surveillance on the March 15 transaction. In Mayer’s report, he noted that Metcalf, who was familiar with Westerfield and knew what he looked like, "could see a visual on [Bray] and Jason Westerfield.” Metcalf later testified that he saw Bray go into a house and saw Westerfield's car pull up to the house, but he did not know whether the man who got out of the car was Westerfield. Both Mayer and Metcalf knew that Westerfield was wearing a GPS issued by the Adult Parole Authority, and Mayer's report noted that they should check the GPS records to confirm his whereabouts at the time of the alleged drug sale. Mott argues that there is no evidence that Mayer and Metcalf checked the GPS records, and Mayer and Metcalf do not dispute this. The GPS records would have revealed that Westerfield was not present at the location of either the March 12 or the March 15 buy.
*635 On March 31, 2005, Bray's girlfriend told the RCSO that Bray had crack cocaine, which the RCSO had not authorized him to have, hidden in the steering wheel of his car. This violated Bray’s Confidential Operative Agreement with the RCSO. He was arrested and charged with drug abuse and possession of drugs. Bray told Metcalf about the incident, offering conflicting explanations for the drugs, and asked Metcalf to help resolve the issue. The case was dismissed.
On November 8, 2005, Lucas testified before a grand jury regarding “Operation Turnaround.’’ He described Mott as “one of the larger drug dealers” from Detroit. Lucas testified that Bray purchased 27.6 grams of cocaine from Mott on September 6, 2005. He also testified that investigators followed Mott and two other men in a Bronco on September 8. Finally, Lucas said that Bray bought 50.8 grams of crack cocaine from Mott on September 15, 2005.
The grand jury issued an indictment on November 9, 2005.... Mott was arrested ... [and] .... explicitly denied selling Bray crack cocaine on September 6, 2005, and September 15, 2005. He admitted to being present at the 435 Tremont Avenue residence on September 6 when Bray was there but stated that both he and Bray purchased crack cocaine from Williams ...
Mott pled guilty to Count One of the superseding indictment on May 24, 2006. The charges regarding the alleged drug buys on September 6 and September 15 were dismissed. Mott also pled guilty on August 29, 2006, to distributing cocaine base while he was out on bail.
The district court concluded that the grand jury’s indictment did not establish probable cause for Mott’s arrest because it was based on false testimony by Lucas. The district court observed that Lucas’s testimony was based entirely upon unreliable, uncorroborated information from Bray and that several of Lucas's statements were misleading or false. Nonetheless, the district court held that there was probable cause to prosecute 'Mott based on his post-arrest statement to investigators that he was involved in drug trafficking. Therefore, the district court concluded that Mott did not meet his burden of producing evidence that his constitutional right was violated and that the defendants are entitled to qualified immunity as to Mott's malicious prosecution claim.
We may reverse a district court’s grant of qualified immunity to defendants on interlocutory appeal where fundamental factual disputes preclude summary judgment .... The district court improperly granted summary judgment to the defendants on the ground that Mott could not meet the second element of his claim [i.e., that there was a lack of probable cause for the criminal prosecution], and, therefore, we reverse .... We remand to the district court so that it may consider whether Mott demonstrates a genuine issue of material fact as to all the elements of his claim, thereby precluding a grant of qualified immunity to the defendants.
Mott, 524 Fed.Appx. at 181-83 (emphasis added).

. The plaintiff in Mott was arrested on November 10, 2005, the same day as France.

. DEA Special Agent Lucas was assigned to the Cleveland Resident Office from around 2000 to 2008. USA001-023379/Sealed Appendix vol. I, filed in Webb v. United States.

. Bray’s guilty plea did not implicate the charges brought against Ballard.

. Plaintiffs’ first amended complaint alleged additional claims that are not at issue in this appeal. PID 215-220/First Am. Comp. filed 4/18/08.

. France App’x 1235-37.

. On May 22, 2009, Metcalf withdrew the affidavit he had filed in support of his motion for summary judgment on qualified immunity grounds. PID 4173-74.

. In September 2012, Nabors moved for partial summary judgment as to liability against Metcalf on his claims of false arrest, malicious prosecution, and fabrication of evidence, and against Richland County based on Monell. PID 7044.

. Subsequently, the district court entered an order on May 29, 2013, substituting the estate of Jerrell Bray for Bráy. R. 212.

. The majority relies on Dunn v. Matatall, 549 F.3d 348, 353 (6th Cir. 2008), for the proposition that the Supreme Court has rejected that the question of objective reasonableness is one of fact best reserved for a jury. Maj. Op. at 626 n. 4. However, in Dunn, a § 1983 excessive-force case arising from the defendant’s arrest, a videotape captured the events surrounding the arrest. The defendant acknowledged that the video must control but asserted that a jury must determine from the video whether the officers used excessive force. Id. at 354. This court observed:
The Supreme Court recently clarified the summary-judgment standard for excessive-force claims, rejecting the argument that the question of objective reasonableness is "a question of fact best reserved for a jury.” Scott, 550 U.S. at 381, 127 S.Ct. at 1776 n.8 (quoting Scott, 550 U.S. at 394-95, 127 S.Ct. at 1784 (Stevens, J., dissenting)). "At the summary judgment stage ... once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record ... the reasonableness of [the defendant's] actions ... is a pure question of law.” Id. ...
Considering the Graham factors, from the Officers’ perspectives on the scene and not using hindsight, we conclude that the video shows that the Officers acted reasonably in attempting to neutralize a perceived threat by physically removing Dunn from his vehicle after he led Officer Matatall on a car chase and then appeared to refuse the Officers' commands to exit the car.
Matatall, 549 F.3d at 353-54. The instant case is more analogous to Sykes, which was decided after Matatall.

. Metcalf testified at France's trial that he and Captain Faith performed surveillance on October 25, 2005, and observed Bray meet with Ron Davis at 187 South Adams Street. PID 1806, 1810-11. Metcalf testified that after Davis met Bray and Lucas, Metcalf continued performing surveillance and saw an African- *642 American woman, who was not blonde, get in the vehicle with Bray and Lucas. PID 1811, 1816.

. After the district court granted Defendants summary judgment in the instant case in 2012, this court in Webb concluded that Faith and Metcalf made false statements that were used to establish or strengthen probable cause to prosecute Davis/Price:
On October 25, 2005, Bray told law-enforcement officers that he could set up a controlled buy with an individual named "Ronald Davis.” "Ronald Davis” was an alias used by Herman Price, but Bray did not learn of this until after Price had been indicted and arrested ....
Also on October 25, 2005, Metcalf and Lucas recorded and monitored two calls that Bray placed to set up the controlled buy. According to Lucas’s report, at 2:05 PM, Bray called a phone number associated with Price. Bray actually called his own girlfriend’s cellphone and spoke with Shay Shay Moxley, a female friend of his girlfriend, to set up a controlled buy. Lucas’s DEA-6 report noted that Bray spoke to a woman named "Lil S” about the drug deal. At 2:08 PM, Metcalf and Lucas monitored and recorded a second call that Bray placed to Marcus English, whom Bray identified to the officers as Price. English was in fact Price’s cousin ....
After these calls, Faith and Metcalf drove to Price's home on 121 Glessner Avenue. According to Lucas’s DEA-6 report and Faith's affidavit for a search warrant of the home, Faith and Metcalf identified Price, observed him departing 121 Glessner Avenue in a silver car, and followed him to 187 South Adams Street. Faith and Metcalf would later admit that they did not see anyone depart 121 Glessner Avenue. While they saw someone driving a silver Caprice on Glessner Avenue, they neither identified the driver nor attempted to follow him.
Webb, 789 F.3d at 670 (emphasis added).